**NATIONAL COAL ASSOCIATION and American Mining Congress, Appellants,**

v.

**Manuel LUJAN, Jr., Secretary of the Interior, et al., Appellees.**

**No. 91–5328.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 22, 1992.

Decided Dec. 1, 1992.

As Amended Dec. 1, 1992.

J. Michael Klise, with whom John A. Macleod, Thomas C. Means, Edward M. Green, Stuart A. Sanderson, and Harold P. Quinn, Jr., Washington, D.C., were on the brief, for appellants.

Peter A. Appel, Attorney, Dept. of Justice, with whom Dirk D. Snel, Attorney, Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before: RUTH BADER GINSBURG, WILLIAMS, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This is an action for judicial review of regulations issued by the Secretary of the Interior on February 8, 1988 under the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201 et seq. (1988). Plaintiffs–Appellants are two associations of coal producers, the National Coal Association and the American Mining Congress (NCA/AMC); the challenged regulations, implementing SMCRA § 518(f), 30 U.S.C. § 1268(f), provide for the assessment of individual civil penalties against officers, directors, and agents of corporate mine operators. The district court, in an unelaborated one-sentence order responding to cross-motions for summary judgment, held for the Secretary. *National Coal Association v. United States Department of the Interior*, No. 88–951 (D.D.C. July 19, 1991).

In this appeal, NCA/AMC first seek an order remanding the case to the district court for an explanation of its decision. Alternately, in the event that we reach the merits, NCA/AMC urge us to set aside the regulations on individual civil penalties as arbitrary, capricious, and inconsistent with law. The Secretary initially contends that the plaintiff trade associations lack standing to sue; on the merits, the Secretary maintains that the regulations are sound and should be affirmed. We hold that the trade associations NCA/AMC have standing to sue. Because a remand would entail unwarranted protraction, we reach the merits and uphold the regulations.

## I. BACKGROUND

Enacted "to protect society and the environment from the adverse effects of surface coal mining operations," 30 U.S.C. § 1202(a), SMCRA establishes an enforcement scheme that includes civil and criminal penalties. *See* 30 U.S.C. § 1268. This dispute involves the relationship between two of SMCRA's civil penalty provisions and the regulations issued under each. The first, which the Secretary calls "a primary enforcement mechanism," *see* Brief for the Federal Appellees at 4, provides for civil penalties against holders of strip-mining permits:

[A]ny permittee who violates any permit condition or who violates any other provision of this subchapter, may be assessed a civil penalty by the Secretary.... Such penalty shall not exceed $5000 for each violation. Each day of continuing violation may be deemed a separate violation for purposes of penalty assessments. In determining the amount of the penalty, consideration shall be given to the permittee's history of previous violations at the particular surface coal mining op-

eration; the seriousness of the violation, including any irreparable harm to the environment and any hazard to the health or safety of the public; whether the permittee was negligent; and the demonstrated good faith of the permittee charged in attempting to achieve rapid compliance after notification of the violation.

30 U.S.C. § 1268(a) (subsection (a)). The parties refer to subsection (a) as the "corporate civil penalties" provision.

Supplementing the provision on corporate civil penalties, and directly at issue in this litigation, SMCRA authorizes the imposition of civil penalties on individual representatives of corporate permittees:

> Whenever a corporate permittee violates a condition of a [Federal] permit[,] ... any director, officer, or agent of such corporation who willfully and knowingly authorized, ordered, or carried out such violation ... shall be subject to the same civil penalties, fines, and imprisonment that may be imposed upon a person under subsections (a) and (e) [criminal penalties] of this section.

30 U.S.C. § 1268(f) (subsection (f)). The Secretary refers to subsection (f), along with provisions for injunctive relief, criminal prosecution, and permit suspension or revocation, as "alternate enforcement mechanisms." *See* Brief for the Federal Appellees at 4–6.

In 1979, the Office of Surface Mining Reclamation and Enforcement (OSMRE, a constituent of the Department of the Interior) issued permanent program regulations to implement subsection (a)'s corporate civil penalty prescriptions. *See* 44 Fed.Reg. 15,461 (1979), *codified at* 30 C.F.R. § 845 (1991).[1] Under the subsection (a) regulations, OSMRE determines the gravity of the permit holder's violation and sets the amount of assessed penalties according to a "point system." Under the point system, a permittee is assigned a score in four categories derived from the factors listed in subsection (a): (1) history

of previous violations; (2) "seriousness" of the violation (determined in part by "the extent of potential or actual damage, in terms of area and impact on the public or environment"); (3) degree of any negligence or greater fault involved in the violation; and (4) good faith in attempting to achieve compliance. *See* 30 C.F.R. § 845.-13. The point total for the violation determines the amount of the permittee's penalty. *See* 30 C.F.R. § 845.14 (penalty table).

Upon finding that a penalty is in order, OSMRE sends the permittee a "proposed assessment"; within 30 days of receipt of OSMRE's proposal, the permittee may request an "assessment conference" to review the proposal, informally, with an OSMRE "conference officer." *See* 30 C.F.R. § 845.18. Within 30 days after the assessment conference is held, the conference officer "shall either ... [s]ettle the issues" or "[a]ffirm, raise, lower, or vacate the penalty." 30 C.F.R. § 845.18(b)(3). If dissatisfied with the conference outcome, the permittee may request a formal administrative hearing and, ultimately, petition for judicial review. *See* 30 C.F.R. § 845.19. Pending pursuit and completion of administrative and judicial review of a corporate penalty, the permittee must place in an escrow account the entire amount assessed by OSMRE. *See* 30 U.S.C. § 1268(c); 30 C.F.R. § 845.19.

The agency did not propose regulations to implement subsection (f), the individual civil penalties provision, until several years after it developed and installed the subsection (a) corporate civil penalties regulations. In 1980 and 1983, however, OSMRE issued successive internal directives "provid[ing] guidance concerning implementation" of subsection (f). *See, e.g.,* OSMRE Directive, Individual Civil Penalty Assessment (issued October 11, 1983), *reprinted in* Joint Appendix (J.A.) at 47. The directives described circumstances in which agency personnel should consider seeking individual civil penalties under subsection (f). *See id.,* J.A. at 47–49 (listing "site

---

**1.** The agency first promulgated rules under subsection (a) as interim regulations in 1977, *see* 42 Fed.Reg. 62,702 (1977), *codified at* 30 C.F.R. § 723 (1991); the 1977 interim regulations did not differ in relevant respects from the permanent program regulations issued in 1979.

criteria" and "individual criteria"). Under the heading "Procedures," the directives stated: "Hearings and conference procedures for individual penalties will be the same as procedures developed for hearings and conferences for regular penalties." *Id.*, J.A. at 49.

In 1986, in response to a consent decree settling a "citizen suit" brought against the Secretary by environmental organizations,[2] OSMRE proposed regulations implementing subsection (f). *See* 51 Fed.Reg. 46,838 (1986). These proposed regulations on individual civil penalties differed from the previously issued corporate regulations in two relevant respects. First, the individual penalty scheme did not provide for assessment conferences. Second, to set the amount of the penalty, the proposed subsection (f) regulations used, in lieu of a point system, a more open-ended balancing of the relevant statutory considerations, tailored to fit individuals. The proposed regulations delineated three factors: the individual's involvement in previous violations; the seriousness of the violation; and the individual's good faith in attempting to achieve rapid compliance. *See* 51 Fed.Reg. at 46,842. The "seriousness" criterion, as stated in the proposed individual regulations, contained a key parenthetical component, one that does not appear in the corporate regulations; the new component concerned the cost of reclamation:

> (2) The seriousness of the violation … (as indicated by the extent of damage *and/or the cost of reclamation* ), including any irreparable harm to the environment and any hazard to the health or safety of the public[.]

*Id.* (emphasis added). On February 8, 1988, with no alteration of the 1986 text significant here, OSMRE issued final regulations governing individual civil penalties. *See* 53 Fed.Reg. 3664 (1988), *codified at* 30 C.F.R. § 846 (1991).

Suing to set aside the final rule containing the individual penalty prescriptions, NCA/AMC trained their attack on the agency's failure to include in the subsection (f) individual penalty regulations two key features included in the subsection (a) corporate penalty regulations: the assessment conference and the point system. *See* 30 U.S.C. § 1276(a)(1) (rules promulgated under SMCRA may be set aside on judicial review if they are "arbitrary, capricious, or otherwise inconsistent with law"). On cross-motions for summary judgment, and after full briefing by the parties, the district court ruled for the Secretary without stating reasons for the court's decision.

## II. THRESHOLD QUESTIONS

### A. *Standing*

■ The Secretary argues, for the first time in the case, that the two plaintiff trade associations lack standing to challenge the individual penalty regulations.[3] In a nutshell, the Secretary points out that NCA/AMC's members are coal companies. The challenged regulations, however, apply only to individuals. According to the Secretary, NCA/AMC have not demonstrated that regulations on penalties for individuals threaten the trade associations or their corporate members with any injury. We find utterly unpersuasive the Secretary's endeavor in this context to divorce the corporation from those who act in its name.

We first recite settled law on the representational capacity of entities like NCA/AMC. An association has standing if its members would have standing to sue in their own right; if it seeks to protect interests germane to its organizational purpose; and if individual members' participation is not required for proper disposition of the litigation. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

---

2. On the history of this "citizen suit," see *Save Our Cumberland Mountains v. Lujan*, 963 F.2d 1541, 1544–46 (D.C.Cir.1992).

3. We are obliged to consider the question, to the extent that it implicates our Article III adjudicatory authority, despite the Secretary's failure to raise a standing objection in the district court. *See, e.g., National Coal Ass'n v. Hodel*, 825 F.2d 523, 526 (D.C.Cir.1987).

Insisting that NCA/AMC's coal company members lack the causally-connected and redressable injury essential to standing, *see Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), the Secretary observes that penalties paid by individuals "do not increase the liability of [NCA/AMC member] coal companies." Brief for the Federal Appellees at 17. The obligation of plaintiffs' member companies to indemnify their officers and agents, the Secretary continues, "would not constitute sufficient injury because the extent of the member companies' responsibility would be determined by independent action, namely the knowing and willful conduct of the members' officers, directors, or agents." *Id.* (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976)). Because a corporate entity ultimately can act only through a human agent, the Secretary's argument appears more formal than substantial.

Arguably, NCA/AMC's coal company members themselves could proceed on behalf of their officers, directors, and agents—the individuals who are subject to subsection (f) penalties—and the trade associations could stand in for those companies. *See New York State Club Ass'n v. New York City*, 487 U.S. 1, 9–10, 108 S.Ct. 2225, 2232, 101 L.Ed.2d 1 (1988) (an association composed of associations has standing to sue if the constituent associations would have standing to sue on behalf of their individual members); *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 574 (3d Cir.1980) (corporation has standing to assert employees' privacy rights implicated by administrative subpoena for employees' medical records). We do not consider that prospect, however, because we are satisfied that the companies' *own* economic interests are vitally affected by the subsection (f) regulations.

The very purpose of the individual penalties for which subsection (f) provides is to impel permittee compliance with SMCRA by giving those who act for the corporation strong cause to adhere to the law and to abate violations promptly. As the agency declared when it issued the regulations, the subsection (f) civil penalty rule is designed "to insure that the requirements of the Act are met"; OSMRE expected that a corporate official would opt to "order the corporate permittee to abate the violation" rather than face stiff individual penalties. 53 Fed.Reg. at 3672. Given the *raison d'être* for individual penalties, moreover, it cannot be seriously doubted that coal companies fall within the zone of interests regulated by subsection (f). *See Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 394–400, 107 S.Ct. 750, 754–57, 93 L.Ed.2d 757 (1987); *see also* 30 U.S.C. § 1276(a)(1) (affording right to judicial review of SMCRA rulemakings to "any person who participated in the administrative proceedings and who is aggrieved by the action of the Secretary").

Unlike *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. at 42–44, 96 S.Ct. at 1926–27, the causal link between the allegedly unlawful action and the alleged injury here is not "speculative." Sure and swift individual penalty imposition, the agency itself reasoned, would propel *corporate* action, thereby advancing the objectives Congress set in SMCRA. No one has suggested any cause to doubt the agency's reasoning on this point. In short, the agency's justification for rendering individual penalty enforcement more efficient and effective belies the standing objection it lately asserts.

In addition to the matter of member standing, the other requirements for associational standing are met. The interests the two plaintiff trade associations seek to protect are germane to their organizational goals of ensuring a favorable regulatory environment and economic health for coal companies. *See Humane Society of the United States v. Hodel*, 840 F.2d 45, 58 (D.C.Cir.1988) ("undemanding" germaneness test requires "mere pertinence between litigation subject and organizational purpose"). Finally, there is no apparent reason why this suit requires the participation of individual companies. NCA/AMC have standing to sue.

### B. *Remand*

NCA/AMC acknowledge that a remand for district court explanation of its summary judgment is not dictated by law. *See*

Fed.R.Civ.P. 52(a) (stating that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule ... 56"). Nevertheless, the trade associations urge the large and practical importance to litigants and this court of explicitly reasoned decisionmaking in the court of first instance. A responsible accounting for its decision by the district court, we agree, informs both the litigants and this court; such an accounting serves the twin objectives of fairness to the parties and judicial economy. Our federal court system works best when the courts that form the foundation of the system give to the litigants and to the judges next in line the full benefit of their analysis. *See, e.g., National Wildlife Fed'n v. Hodel,* 839 F.2d 694 (D.C.Cir.1988) (affirming in large part several district court decisions that substantially reduced number of issues in controversy); *In re Korean Air Lines,* 829 F.2d 1171 (D.C.Cir.), *affirming order and adopting opinion of district court in* 664 F.Supp. 1488 (D.D.C.1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); *Universal Health Servs. of McAllen, Inc. v. Sullivan,* 770 F.Supp. 704 (D.D.C.1991), *aff'd mem.,* 978 F.2d 745 (D.C.Cir.1992).

In this case, however, several considerations lead us to resist a remand. The issues presented are few and clearly defined; the case has been well briefed and argued; it is our obligation in any event to review the administrative record de novo, and here that record is not dense. *Cf. Randolph–Sheppard Vendors of America, Inc. v. Harris,* 628 F.2d 1364, 1368 (D.C.Cir.1980) (refusing to remand for district court clarification where no facts were in dispute and record was adequate to enable this court to review agency rules de novo). Mindful of the years it has taken to complete the SMCRA penalty provision rulemakings, and unwilling further to delay final decision on the regulations, we proceed to the merits of NCA/AMC's case.

### III. VALIDITY OF THE SUBSECTION (F) REGULATIONS

■ NCA/AMC portray the Secretary's decision not to include the assessment conference procedure or the point system in the subsection (f) regulations as a "reversal of the agency's former views"; under *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 2865–66, 77 L.Ed.2d 443 (1983) (*State Farm*), NCA/AMC assert, such a reversal must be supported by "reasoned analysis." The Secretary responds that because formal regulations had never before been issued under subsection (f), OSMRE was working on a clean slate; hence, OSMRE was not required to justify its choice not to copy exactly the procedures adopted years earlier in the subsection (a) regulations. *See State Farm,* 463 U.S. at 42, 103 S.Ct. at 2866 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change *beyond that which may be required when an agency does not act in the first instance.*") (emphasis added). Neither side, we conclude, has it entirely right.

Subsections (a) and (f) are interrelated and cross-referenced; the statutory provision applicable to individuals incorporates, in part, those governing corporations. Moreover, the agency relied on the corporate procedures when it framed interim, internal directives on individual penalties. *See supra* pp. 1550–51. This statutory relationship and regulatory history made it incumbent on OSMRE to say why it chose to depart from the corporate scheme when it adopted the individual regulations.

But concise statement would do. The challenged individual penalty regulations were not a *volte-face* as was the change at issue in *State Farm. See* 463 U.S. at 41–42, 103 S.Ct. at 2865–66. There, an agency abandoned without cogent explanation a policy option it had earlier studied extensively and strongly endorsed. *See id.* at 46–51, 103 S.Ct. at 2868–71. Here, by contrast, the agency has not abandoned or rescinded a policy; it has simply refused permanently to extend to individual penalty enforcement certain policy approaches developed in the context of corporate penal-

ties. In promulgating the regulations on corporate penalties, the agency did not purport to address individual penalties as well. OSMRE's initial directives on individual penalties were notably provisional in character. In this setting, the burden of explanation derived from *State Farm* is relatively light.

## A. Assessment Conferences

■ The assessment conference procedure was part of the initial corporate penalty scheme in 1977, and was incorporated into the permanent program regulations issued in 1979. *See* 30 C.F.R. § 723.18 (1991); 30 C.F.R. § 845.18 (1991). The preamble to the 1977 interim regulations described the assessment conference as an opportunity "to discuss informally the facts relevant to the proposed assessment and reach an agreement on the proper assessment without a formal hearing." 42 Fed. Reg. 62,639, 62,672 (1977). In its discussion of the 1979 corporate penalty regulations, the agency further explained:

> The conference procedure insures the Office of correct assessments by taking into account good faith and any other relevant information. This prevents the underpayment or overpayment of the penalty into escrow, and provides a much greater measure of due process to the operator, who is assured of an opportunity to be heard and to obtain a correction of the penalty before having to put his money into escrow.

44 Fed.Reg. 14,902, 15,309 (1979).

The subsection (f) individual penalty regulations proposed in 1986 included no assessment conference. OSMRE explained that the basic reason for the conference was inapplicable to subsection (f) penalties because individuals, unlike corporate violators, were not required to prepay penalties

into escrow pending administrative and judicial review. *See* 51 Fed.Reg. at 46,841. In response to a commenter who had suggested that the subsection (f) regulations provide for assessment conferences, the agency comprehensively explained:

> The rules provide an adequate opportunity for administrative review through [the Department of the Interior's Office of Hearings and Appeals (OHA)]. No need exists to create an additional level of administrative review in OSMRE. As was previously stated, the corporate official is not required to pre-pay the assessment as a prior condition to requesting a hearing with OHA; thus no due process violation exists. Moreover, the notice of proposed assessment against the corporate official will contain a detailed narrative explanation of the reasons for the assessment and the amount assessed, so that the corporate official will clearly understand why OSMRE believes that an individual civil penalty is justified. It has been OSMRE's experience with corporate violations that almost everyone requests both an assessment conference and a hearing with OHA, so that rather than eliminate administrative waste and inconvenience a conference simply would add another step in the process and increase the government's administrative costs. Finally, an individual civil penalty will be assessed only for knowing and willful conduct. Questions concerning such conduct may be better resolved by an administrative law judge, rather than an assessment conference officer.

53 Fed.Reg. at 3671. There is no need for more words on this issue. This uncommonly concise, complete and convincing agency explanation fully satisfies *State Farm's* demand for "reasoned analysis." 463 U.S. at 42, 103 S.Ct. at 2866.[4]

---

4. NCA/AMC point out that, as OSMRE acknowledged, the subsection (f) regulations were "modeled in part" on regulations of the Mine Safety and Health Administration, *see* 53 Fed.Reg. 3664, 3665 (1988), and the MSHA regulations provide for assessment conferences even though prepayments into escrow are not required. NCA/AMC also note that the legislative history of SMCRA reveals that Congress viewed the Federal Coal Mine and Safety Act (the successor

of which is administered by MSHA) as a model for SMCRA's enforcement scheme. See S.Rep. No. 128, 95th Cong., 1st Sess. 58 (1977) ("Generally the enforcement provisions of this bill have been modeled after the similar provisions of the [FCMSA]."). OSMRE's use of MSHA regulations as a model, however, did not require it to adopt each approach taken by MSHA.

NCA/AMC also suggest that omission of settlement conference procedures is inconsistent

## B. The "Same Penalties" Clause of Subsection (f)

Subsection (f) declares individual directors, officers, or agents subject to the "*same* civil penalties, fines, and imprisonment that may be imposed upon a person under subsections (a) and (e) of this section." 30 U.S.C. § 1268(f) (emphasis added). NCA/AMC argue that OSMRE ignored this requirement when it adopted procedures for setting the amounts of individual penalties that did not conform to the procedures previously established for corporate penalties. In particular, NCA/AMC attack the agency's failure to use the point system in the subsection (f) penalty scheme and its adoption of a novel measure of "seriousness" explicitly based on reclamation costs.

SMCRA is administered by an office of the Department of the Interior. We must defer to that agency's interpretation of the "same penalties" provision unless the agency's reading is contrary to the statute's instruction, or is unreasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). In promulgating the individual penalty regulations, OSMRE explained that it construed the subsection (a) "same penalties" language "to mean that the relevant criteria of [subsection (a)] are to be applied, and that the daily ceiling in [subsection (a)] on the amount of the penalty must be observed when assessing an individual civil penalty." 53 Fed.Reg. at 3669. But, the agency added, the "same penalties" provision does not require "the amount of the penalty assessed against the individual to be the same as that assessed against the corporation." *Id.*

We find no explicit or implicit instruction in subsection (f) telling us whether the "same penalties" requirement means that the corporate and individual penalty assessments must be calculated using the identical methodologies, or whether, as the agency maintains, "same penalties" means only that the criteria of subsection (a) must also be used in subsection (f) analysis and that the penalty ceilings must be the same. The text of the statute does make it plain that the factors for assessing corporate and individual penalties are not identical; notably, the corporate provisions require consideration of "whether the permittee was negligent," while the subsection (f) provisions are inapplicable unless the individual director, officer, or agent acted "willfully and knowingly." This difference heightens our skepticism regarding the trade associations' position that Congress intended the "same penalties" language to require precisely parallel assessment methodologies.

NCA/AMC have indicated what Congress might have said to convey the meaning the trade associations urge. Subsection (f) uses the words "same civil penalties." On brief, NCA/AMC translate these words to command the same "civil penalty *scheme*." Brief of Appellants at 16 (emphasis added). Nothing coming from Congress obliged the agency to agree. In sum, the statute is silent on the methods the agency should use in fixing the amount of the penalty, and OSMRE reasonably concluded that the "same penalties" phrase did not *require* adoption of the point system for individual penalties. We take up *infra* at p. 1556 NCA/AMC's further argument that, even if not ruled out by statute, the agency's abandonment of the point system in the individual penalties regulation was arbitrary and capricious.

We treat next NCA/AMC's statutory objection to OSMRE's use of reclamation costs in the individual penalty assessment calculus. The corporate penalty regulations assign gravity-of-violation points for seriousness based on "the extent of the potential or actual damage, in terms of area and impact on the public or environment[.]" 30 C.F.R. § 845.13(b)(2)(ii) (1991). The individual penalty regulations include as a measure of the seriousness of a violation "the cost of reclamation." 30 C.F.R.

with Congress' desire to have fair penalty procedures, but the trade associations' quotation from SMCRA's legislative history is incomplete. *See id.* ("[T]he most effective reclamation occurs when sound performance standards go hand in hand with strong, equitable enforcement mechanisms.").

§ 846.14(a)(2) (1991). We see no reason why the "cost of reclamation" does not fit within the statutory criterion of "seriousness" or why the agency should be locked into the subsection (a) regulations' formulation of that criterion. *See Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2792 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."). Again, we agree with the agency that the "same civil penalties" language of subsection (f) does not *mandate* the degree of conformity NCA/AMC ask us to impose.

### C. *Rationality of Reclamation Costs*

■ Having concluded that the statute did not bar OSMRE's departures from the corporate penalties regulation when it framed the individual penalties regulation, we consider, finally, NCA/AMC's charges that the agency's resort to reclamation costs and its omission of the point system were inadequately explained. When it issued the subsection (f) individual penalty regulations, OSMRE stated that, in its view, "the amount of money it will cost to abate the violation and/or reclaim the affected area" could serve as "[o]ne accurate indicator" of the extent of environmental damage. 53 Fed.Reg. at 3669. OSMRE then explained that using reclamation costs in assessing penalties appropriately advanced a statutory scheme in which individual penalties are an alternative mechanism of enforcing permittee compliance:

> OSMRE intends in some instances to propose an individual civil penalty which equals or exceeds the cost of abating the violation under the theory that it would be more economical for the corporate official to order the corporate permittee to abate the violation than to pay the penalty....

53 Fed.Reg. at 3672. The agency thus justified the reclamation costs standard as an incentive for corporate officials to ensure compliance with SMCRA. We see nothing unreasonable here. Again, we cannot fault the agency, in face of the rationality of its position, simply because the regulations on corporate penalties do not similarly refer to reclamation costs.[5]

### D. *Rationality of Omitting Point System*

Relying once more on *State Farm,* NCA/AMC contend that OSMRE failed adequately to explain why the point system, although used in the regulations governing corporate penalties, was not used in the individual penalty regulations. The trade associations feature statements made in 1979 by then Acting Secretary James A. Joseph when the subsection (a) regulations issued. The Acting Secretary praised the point system as "the only adequate way to achieve rational and consistent assessments" and said that "[c]areful thought" had been given to the weights assigned the respective criteria. 44 Fed.Reg. at 15,305–06. NCA/AMC argue that the point system could have accounted for relevant differences between individuals and corporations, and underscore that the subsection (a) point system was based on MSHA regulations, which apply to corporate and individual penalties alike. *See id.*

■ When it promulgated the individual penalty regulations in 1988, OSMRE explained that, based on an examination of "existing rules and policies related to the assessment of civil penalties," the point system

> does not appear practical for, nor strictly applicable to, the assessment of individual civil penalties [and] does not give the Secretary sufficient flexibility to assess a

---

**5.** More than seven years separated the promulgation of the permanent corporate regulations and the issuance of proposed individual regulations; we note, in view of this interval, that developments in regulatory philosophy and methods and the accumulation of experience may legitimately form the basis for shifts in agency policy. *See State Farm,* 463 U.S. at 42, 103 S.Ct. at 2866; *see also id.* at 59, 103 S.Ct. at 2875 ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.") (Rehnquist, J., dissenting in part).

penalty which fairly considers the particular actions or inactions of an individual. For example, [the corporate penalty regulations] consider the history of the permittee's previous violations without respect to the individual's involvement with them.

53 Fed.Reg. at 3664. The agency thus decided that the point system applicable to corporate violators was inappropriate for individual violators. The path the agency has taken on this point "may reasonably be discerned." *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867 (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). Substantial modifications would have been required to create a point system applicable to subsection (f) cases. In addition to modifying the history-of-previous-violations criterion, a point system for individuals would have to adjust for the different mens rea standard (individual violations, but not corporate violations, require knowing and willful misconduct). The agency's new emphasis on reclamation costs would also require attention. *See* 53 Fed.Reg. at 3670 ("[T]he penalty assessed against the corporate permittee under the point system for the seriousness of the violation in many instances may not cover the actual cost to repair the damage to the environment.").

OSMRE evidently decided, in light of its experience administering the subsection (a) corporate penalty provisions, that the point system was not well suited to individual violations. We cannot gainsay that experience and judgment.[6] Nor can we impose on the agency a requirement of perfect consistency. OSMRE may eventually decide to alter the corporate regulations once the individual provisions have been tested. NCA/AMC surely do not urge that the agency embark on such a change now.

### Conclusion

NCA/AMC have standing to challenge the individual penalty regulations because those regulations directly affect the inter-

ests of the associations' corporate members. While we and the litigants would have been aided by a reasoned district court decision, considerations specific to this case counsel against a remand. Because the individual civil penalty regulations under review are not "arbitrary, capricious, or otherwise inconsistent with law," the judgment of the district court in favor of the Secretary is

*Affirmed.*

---

**6.** As we have pointed out in relation to assessment conferences, the agency's reliance on MSHA regulations as a guide for SMCRA rules

did not require it to adopt the MSHA scheme lock, stock, and barrel. *See supra* note 4.