**COUNCIL OF INSURANCE AGENTS + BROKERS, Plaintiff,**

v.

**Tom GALLAGHER, in his official capacity as Commissioner of Insurance for the State of Florida, Defendant.**

No. 4:02cv208–RH.

United States District Court,
N.D. Florida,
Tallahassee Division.

Sept. 30, 2003.

Scott A. Sinder, Christy Hallam Desanctis, Collier, Shannon, Scott Pllc—Washington, DC, Washington, DC, for Plaintiff.

David J. Busch, George Lee Waas, Attorney General's Office, Tallahassee, FL, for Defendants.

### ORDER GRANTING SUMMARY JUDGMENT FOR PLAINTIFF

HINKLE, District Judge.

In this action the plaintiff trade association challenges Florida statutes that preclude a property and casualty insurance agent who is duly licensed by the State of Florida but resides outside the state from placing coverage in the state without the participation of—and payment of a substantial share of the premium to—a licensed agent who resides within the state. The plaintiff also challenges provisions that discriminate against Florida-licensed but nonresident agents in other respects. The effect and only discernible purpose of the statutes is to protect the financial interests of agents who reside in Florida. At oral argument on cross-motions for summary judgment, the defendant Commissioner of Insurance conceded that any such distinction between Florida-licensed agents based solely on their state of residence would serve no purpose; the Commissioner contended, however, that the statutes draw no such distinction. Because the statutes plainly draw a distinction between Florida-licensed resident agents and Florida-licensed nonresident agents, and because there is no legitimate rational basis for any such distinction, I grant summary judgment for the plaintiff and declare unconstitutional those portions of the statutes at issue that discriminate against Florida-licensed nonresident agents.

### I

#### The Statutes at Issue

Two statutory principles are at issue. The first is the "countersignature" requirement. The second deals with surplus lines coverage. Each limits the services that may be provided by agents who are licensed by the Florida Department of Insurance but reside outside of Florida.

### A

#### Countersignature

The "countersignature" statutes provide that when property or casualty insurance is placed for any Florida risk, an agent who is a *"resident of this state"* must participate in—and be paid at least a specified share of any commission for—the placement of the coverage. §§ 624.425(1) & 626.741(5)(a), Fla. Stat. (emphasis added).[1] Thus any policy must be "countersigned" by a Florida resident agent, who must be paid at least 50% of the total commission with respect to property coverages, and at least 25% of the total commission with respect to other coverages. § 626.741(5)(a), Fla. Stat. Further, a Florida-licensed but *nonresident* agent cannot solicit, negotiate, or effect any coverage in the state, "unless accompanied by a countersigning agent, *resident in this state.*" § 626.741(4), Fla. Stat. (emphasis added). In short, Florida-licensed nonresident agents may place coverage for Florida risks, but they cannot do

---

1. All citations to the Florida statutes are to the officially codified Florida statutes as in effect since October 1, 2002. The parties cited in their memoranda and at oral argument the version in effect prior to October 1, 2002. The numbering has changed, but there have been no changes of substance.

so alone; they must be "accompanied by," and share their commissions in substantial part with, agents who reside in Florida.

More completely, § 624.425 provides:

(1) Except as stated in s. 624.426,[2] no authorized property, casualty, or surety insurer shall assume direct liability as to a subject of insurance resident, located, or to be performed in this state *unless the policy or contract of insurance is issued by or through, and is countersigned by, a local producing agent who is a resident of this state,* regularly commissioned and licensed currently as an agent and appointed as an agent for the insurer under this code. If two or more authorized insurers issue a single policy of insurance against legal liability for loss or damage to person or property caused by the nuclear energy hazard, or a single policy insuring against loss or damage to property by radioactive contamination, whether or not also insuring against one or more other perils proper to insure against in this state, such policy if otherwise lawful may be countersigned on behalf of all of the insurers by a licensed and appointed resident agent of any insurer appearing thereon. Such agent shall receive on each policy or contract the full and usual commission allowed and paid by the insurer to its agents on business written or transacted by them for the insurer.

(2) If any subject of insurance referred to in subsection (1) is insured under a policy, or contract, or certificate of renewal or continuation thereof, issued in another state and covering also property and risks outside this state, a certificate evidencing such insurance as to subjects located, resident, or to be performed in this state, shall be issued by or through and shall be countersigned by the insurer's commissioned

and appointed local producing agent *resident in this state* in the same manner and subject to the same conditions as is provided in subsection (1) as to policies and contracts; except that the compensation to be paid to the agent may relate only to the Florida portion of the insurance risks represented by such policy or contract.

(3) An agent shall not sign or countersign in blank any policy to be issued outside her or his office, or countersign in blank any countersignature endorsement therefor, or certificate issued thereunder. An agent may give a written power of attorney to the issuing insurance company to countersign such documents by imprinting her or his name, or the name of the agency or other entity with which the agent may be sharing commission pursuant to s. 626.753(1)(a) and (2), thereon in lieu of manually countersigning such documents; but an agent shall not give a power of attorney to any other person to countersign any such document in her or his name unless the person so authorized is directly employed by the agent and by no other person, and is so employed in the office of the agent.

§ 624.425, Fla. Stat. (emphasis added).

Further, § 626.741, which authorizes licensure of agents who do not reside in Florida, provides:

(4) Such a nonresident shall not directly or indirectly solicit, negotiate, or effect insurance contracts in this state *unless accompanied by a countersigning agent, resident in this state,* on such risk.

(5)(a) All insurance policies as defined in s. 627.402, written under the nonresident agent's license, including those

---

**2.** The exceptions set forth in § 626.426 are for reinsurance, insurance on railroad rolling

stock, certain federal surety bonds, and certain captive insurers.

written or issued pursuant to the Surplus Lines Law, part VIII, on risks or property located in this state must be countersigned by a local agent resident of this state; and it shall be the duty and responsibility of the nonresident agent, and, if called upon to do so by the countersigning agent, of the insurer likewise, to assure that such resident local agent receives the same commission as allowed by the home state of the nonresident agent, but in no event shall the resident local agent receive, accept, or retain less than 50 percent of the usual Florida local agent's commission or 50 percent of the nonresident agent's commission, whichever is less, on policies of insurance covering property as defined in s. 624.604 and insurance covering in whole or in part real property and tangible personal property, including property floater policies. On all other policies of insurance, including insurance covering motor vehicles, plate glass, burglary, robbery, theft, larceny, boiler and machinery, workers' compensation, fidelity and surety, bodily injury liability, and property damage liability, in no event shall he or she receive, accept, or retain less than 25 percent of the usual Florida local agent's commission or 25 percent of the nonresident agent's commission, whichever is less.

§ 626.741, Fla. Stat. (emphasis added).

## B

### Surplus Lines License

Most insurance coverage in Florida, as in other states, is provided by insurers fully regulated by, and "admitted" to provide coverage in, the state. When coverage is not available from any "admitted" insurer, however, coverage may be obtained from a "surplus lines" insurer. Surplus lines insurers are regulated by the state, but to a lesser extent than admitted insurers. Surplus lines insurers need not meet all the same requirements as admitted insurers.

A licensed insurance agent may place surplus lines coverage only if he or she obtains a separate license as a surplus lines agent. Under § 626.927(1), a Florida-licensed but nonresident agent is ineligible for a surplus lines license. The statute provides:

Any individual while licensed and appointed as a *resident* general lines agent as to property, casualty, and surety insurances, and who is deemed by the department to have had sufficient experience in the insurance business to be competent for the purpose, and who, within the 4 years immediately preceding the date the application was submitted, has a minimum of 1 year's experience working for a licensed surplus lines agent or who has successfully completed 60 class hours in surplus and excess lines in a course approved by the department, may be licensed as a surplus lines agent, upon taking and successfully passing a written examination as to surplus lines, as given by the department.

§ 626.927(1), Fla. Stat. (emphasis added). Thus a Florida-licensed nonresident agent may not obtain a Florida surplus lines license.

## II

### The Parties' Contentions

Plaintiff Council of Insurance Agents + Brokers challenges these statutes under the Privileges and Immunities Clause and Equal Protection Clause of the United States Constitution. The defendant Commissioner asserts the Council lacks standing to present these claims. The Commissioner also asserts the statutes are constitutional. Each side has moved for summary judgment.

## III

### Standing

■ Plaintiff Council of Insurance Agents + Brokers, founded in 1913, is a trade association whose members include many of the nation's largest commercial property and casualty insurance agencies and brokerage firms. The Council's members place some 80% of all United States insurance products and services covering industry, government and the public. Premiums on business placed by the Council exceed $90 billion annually.

The Council's members are corporations and partnerships. Some place insurance coverage in all 50 states. Many of the insureds whose coverage is placed by Council members have multi-state exposures. It is a common occurrence for a potential insured to seek coverage through a Council member for risks in many states.

The Council's members have employees who are duly licensed as agents by the Florida Department of Insurance but who reside outside of Florida. The statutes at issue preclude such employees from performing services they otherwise would perform and deny Council members revenue they otherwise would receive. The statutes cause Council members to lose many thousands of dollars per year in commissions.

The Council, whose mission includes advocating the interests of its members, challenges the statutes at issue under the Privileges and Immunities Clause and Equal Protection Clause of the United States Constitution. The constitutional rights on which the Council relies belong not to the Council itself, but to employees of members of the Council. In contending it has standing to assert those rights, the Council seeks to stack two different theories under which a litigant may assert the constitutional rights of others. First, the Council argues it has standing as an association to assert the rights of its members. Second,

the Council contends that its members—corporations and partnerships—have standing to assert the rights of their employees and partners, including Florida-licensed nonresident agents who are directly impacted by the statutes at issue.

The Council is correct on each score. Standing to assert constitutional *jus tertii* can be stacked. The Council has associational standing to assert the rights of its members. And the members have standing to assert the rights of their employees and partners. The Council thus has standing to assert the rights of the employees and partners.

### A

### Stacking

■ In *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), the plaintiff was a nonprofit association (referred to as a consortium) comprised of 125 private associations. The consortium brought an action based on the constitutional rights of members of the 125 associations. The defendant acknowledged that, under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the consortium had standing to assert the rights of its members—the 125 associations—but the defendant asserted this authorized the consortium "to sue only on behalf of [the member associations] themselves, and not on behalf of anyone else, such as [the associations'] own individual members." 487 U.S. at 9, 108 S.Ct. 2225. The Supreme Court disagreed:

This reading of *Hunt* is incorrect. Under *Hunt*, an association has standing to sue on behalf of its members when those members would have standing to bring the same suit. *It does not matter what specific analysis is necessary to determine that the members could bring the same suit*, for the purpose of the

first part of the *Hunt* test is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation. Here, however, *the appellant consortium has standing to sue on behalf of its member associations as long as those associations would have standing to bring the same challenge.*

*Id.* (emphasis added). Thus standing to assert constitutional *jus tertii* may be stacked. *See also Nat'l Coal Ass'n v. Lujan,* 979 F.2d 1548, 1551–52 (D.C.Cir.1992) (suggesting the appropriateness of stacking); Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531.9 at 991–92 (Supp. 2003) (noting appropriateness of stacking associational standing).

## B

### Associational Standing

■ An association has standing to assert the rights of its members if it can show that:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Nat'l Parks Conservation Ass'n v. Norton,* 324 F.3d 1229, 1244 (11th Cir.2003) (quoting *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434). The first two elements are constitutional and jurisdictional under Article III; the third element is prudential. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 555–57, 116 S.Ct. 1529, 1536–37, 134 L.Ed.2d 758 (1996).

■ Here the Council easily meets these prerequisites to associational standing. The Council's members would have standing to sue in their own right: the Council has submitted uncontradicted evidence that its members have lost many thousands of dollars as the direct result of the statutes at issue, *see* Crerar Aff. ¶¶ 6–7, and, as set forth below, the members could properly assert the constitutional rights of their employees and partners. The interests the Council seeks to protect are germane to its purpose; promoting the interests of Council members on just such regulatory issues as these is close to the core of its being. *See* Crerar Aff. ¶ 3; *Int'l Union, UAW v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 2533, 91 L.Ed.2d 228 (1986) ("[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others."). And neither the claim presented nor the relief requested requires participation of individual members in this action; the constitutional issues can be fully addressed, and complete relief can be provided, without their involvement.[3]

---

3. "[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975); *id.* ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind."). Member participation is not required where individualized proof is unnecessary, the plaintiff seeks no money damages, and the question presented is purely legal. *Brock,* 477 U.S. at 287–88, 106 S.Ct. 2523 (distinguishing *Warth* because it required individualized proof for an award of money damages); *Pennsylvania Psych. Soc'y v. Green Spring*

## C

### Employer Standing

■ In *Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800 (11th Cir.1993), the court addressed an attempt by a number of companies to assert standing on behalf of their respective employees. The court observed that, as a general rule, such attempts violate "the prudential limitation that plaintiffs must assert their own rights and may not rest upon the rights of others." *Id.* (citing *Warth*, 422 U.S. at 499, 95 S.Ct. 2197). Applying general third-party standing principles, however, the court recognized that this limitation is avoided, and a plaintiff has standing to assert a third-party's rights,

> when (1) the plaintiff seeking to assert the third party's rights has otherwise suffered an injury-in-fact, (2) the relationship between the plaintiff and the third party is such that the plaintiff is nearly as effective a proponent of the third party's right as the third party itself, and (3) there is some obstacle to the third party asserting the right.

*Id.* at 810 (citing *Singleton v. Wulff*, 428 U.S. 106, 113–16, 96 S.Ct. 2868, 2873–75, 49 L.Ed.2d 826 (1976)). The court explicitly said that this test must be met by the employer; the *Hunt* prerequisites to associational standing (as quoted above) need not be met:

> The district court ... concluded that the [plaintiffs] lacked standing to assert the interests of their employees. However, rather than using the third-party standing analysis to reach this conclusion, the district court used the three part test for associational standing set forth in *Hunt*

.... [W]e do not agree with the its [sic] method. The associational standing test articulated in *Hunt* is properly reserved for voluntary membership organizations—like trade associations or environmental groups—and has no application to a corporation's standing to assert the interests of its employees.

*Id.* at 810 n. 15.

The *Region 8* test is easily met in the case at bar. The employers at issue have suffered injury in fact to the tune of many thousands of dollars in lost revenues. The relationship between the employers and employees is such that the employers are not only "nearly as effective" as proponents of the rights at issue as the employees themselves; the employers are more effective, because they have the financial ability to join in a trade association with the wherewithal to contest the issue. And there is "some obstacle" to the employees presenting their own rights, both in terms of ability to finance the litigation, and more importantly because regulated individuals may reasonably fear—and the Council represents that the employees do fear—that there would be reprisal if they challenged the relevant positions of their regulator.

■ *Region 8* was not, however, the Eleventh Circuit's last word on this subject. More recently, in *White's Place, Inc. v. Glover*, 222 F.3d 1327 (11th Cir.2000), the court said that an employer may assert its employee's rights only if it meets the *Hunt* test for associational standing. *See id.* at 1329–30. The court did not cite *Region 8*. Under the law of the circuit, the older case, *Region 8*, is the controlling

*Health Servs.*, 280 F.3d 278, 284 n. 3 (3d Cir.2002) ("Individual participation by an association's membership may be unnecessary when the relief sought is prospective (i.e., an injunction or declaratory judgment)."); *Columbia Basin Apartment Ass'n v. City of Pas-*

*co*, 268 F.3d 791, 799 (9th Cir.2001) ("Appellants request only injunctive and declaratory relief. Because these forms of relief do not require individualized proof, the third prong of the *Hunt* test is satisfied.").

precedent. *See, e.g., Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co.,* 106 F.3d 970, 975 (11th Cir.1997); *Mesa v. United States,* 61 F.3d 20, 22 n. 5 (11th Cir.1995). Moreover, *Region 8* more closely accords with the best reasoned decisions from other circuits. *See, e.g., Hang On, Inc. v. City of Arlington,* 65 F.3d 1248, 1252 (5th Cir.1995) (analyzing employer/employee standing as a prudential matter and observing that "[o]rdinarily, a business like Hang On may properly assert its employees' or customers' First Amendment rights where the violation of those rights adversely affects the financial interests or patronage of the business."); *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 574 (3d Cir.1980) (granting corporation standing to invoke privacy interests of employees under prudential standing principles). *Region 8* thus sets forth the controlling test.

In any event, in the case at bar the difference in approach between *Region 8* and *White's Place* makes no difference, because the employers at issue easily meet the *Hunt* test for associational standing, as well as the *Region 8* test for employer standing. The *Hunt* test imposes three requirements: that the employees would otherwise have standing to sue in their own right, as they clearly would; that the interests the employers seek to protect are germane to their purpose, which they are (placing coverage and earning commissions is the employers' reason for existence); and that neither the claim asserted, nor the relief requested, requires the partic-

ipation of individual members in the lawsuit, which (as set forth above) they do not.

In sum, the Council has standing to assert claims on behalf of its members, the members have standing to assert the rights of their employees and partners, and the Council thus has standing to assert the constitutional rights of the employees and partners—Florida licensed but nonresident agents.[4]

## IV

## Merits

This is one nation with one economy. Each individual state retains its own sovereignty and its own ability to govern within its borders. A state thus may require that persons seeking to engage in any particular form of economic activity—acting as an insurance agent, for example—demonstrate their competence and meet appropriate prerequisites to licensure. But no state may build a fence at the border to keep out residents of other states or to keep them from competing for business within the state. Thus nonresidents who meet the same standards that a state imposes on its own residents ordinarily may not be barred from plying their trade within the state.

These principles are well illustrated by *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985). The state of New Hampshire, like all states, required licensure as a prerequisite to practicing law; to

4. That the claims at issue arise partly under the Privileges and Immunities Clause makes no difference. It is true, as the Commissioner notes, that the Privileges and Immunities Clause applies only to natural persons, not to corporations or other business entities. *See, e.g., W. & S. Life Ins. Co. v. Bd. of Equalization,* 451 U.S. 648, 656, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) ("[T]he Privileges and Immunities Clause is inapplicable to corpora-

tions ...."). It is thus only the individual nonresident agents who have rights under that clause. But the Council has standing to assert rights of the individuals. That is the whole point of the doctrines of associational and employer standing—that entities who do not themselves have the rights at issue may assert the rights of those who *do* have such rights.

provide legal services in New Hampshire, a person was required to meet certain standards and become a member of the state bar. The state obviously was entitled to regulate the practice of law in this manner. But New Hampshire also imposed another requirement: to obtain the required license (that is, to become a member of the state bar) one had to be a resident of New Hampshire. The Supreme Court struck down that requirement. *Id.* at 280, 105 S.Ct. 1272 (stating that the Privileges and Immunities Clause guarantee "to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State").

◼ The clear teaching of *Piper* is that the state cannot ordinarily condition a professional license on residency within the state. The principle is fully applicable to insurance agents. *See, e.g., Silver v. Garcia,* 760 F.2d 33, 38 (1st Cir.1985) (striking down Puerto Rico's law that nonresidents did not qualify for insurance consultant licenses, expressly holding that "Puerto Rico's refusal to issue a license ... implicated a fundamental right.... The ability of a citizen of one state to act as an insurance consultant in another state must be considered a fundamental right or privilege protected by the privileges and immunities clause."). The principle is fully applicable and dispositive in the case at bar.[5]

The Commissioner apparently takes no issue with *Piper* or with its applicability to insurance agents. Indeed, the Commissioner explicitly analogizes the licensure of insurance agents to the licensure of attorneys. The commissioner notes, quite correctly, that only members of the Florida Bar may practice law in Florida. Members of other state bars may come into the state—for example, appearing *pro hac vice*—but they do not have the same rights and privileges as members of the Florida Bar.

The Commissioner's analogy between insurance agents and attorneys is both apt and fatal to the Commissioner in this case. The analogy is apt because practicing law, like placing insurance, is a proper subject for state regulation; indeed, both are areas in which a state properly can and clearly should require an appropriate showing of relevant expertise. The analogy is fatal because the state cannot require an insurance agent who makes the appropriate showing of relevant expertise to be a *resident* of the state as prerequisite to licensure, just as a state cannot require residency for admission to the state bar. *Piper* squarely so held with respect to attorneys, and the same principle obviously applies to insurance agents.

Far from disagreeing with this analysis, at oral argument the Commissioner seemingly embraced it. The Commissioner agreed that any distinction between Florida-licensed agents who reside in Florida and Florida-licensed agents who reside outside Florida would serve absolutely no purpose. (Document 39 at 11–12.) Inexplicably, however, the Commissioner asserted the statutes at issue draw no such distinction. But as set forth above, the statutes clearly *do* draw such a distinction. Nonresidents may become members of the Florida Bar with all the same rights and privileges as resident members of the Florida Bar. Nonresidents also may become Florida-licensed insurance agents, but under the statutes at issue, such non-

5. This is so notwithstanding the Commissioner's citation to *Osborn v. Ozlin,* 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074 (1940), a 73-year old case in which a countersignature law was challenged not under the Article IV, Section 2 Privileges and Immunities Clause, but under unspecified "rights protected by the Fourteenth Amendment of the Constitution." *Id.* at 60, 60 S.Ct. 758.

residents *do not* have the same rights and privileges as resident agents. Nonresidents cannot "solicit, negotiate, or effect insurance contracts" unless accompanied by resident agents, they cannot keep the entire commissions generated on the business they place, and they cannot apply for and become licensed as surplus lines agents.

These prohibitions are unconstitutional.

To be sure, the Commissioner cites various cases for the proposition that a state in which a risk is located may require participation of an agent licensed by that state in the placement of coverage for that risk. That is correct but does not help the Commissioner in this case. The Council does not challenge the ability of the State of Florida to require participation of Florida-licensed agents in placement of local risks. The challenge is only to the state's refusal to allow Florida-licensed nonresident agents the same rights and privileges afforded Florida-licensed agents who reside in Florida.

None of the purposes invoked by the Commissioner to support the mandatory involvement of Florida-licensed agents provides any support for the statutes' discrimination against Florida-licensed nonresident agents.

Agents must have sufficient knowledge and expertise, both with respect to Florida law and with respect to the insurance products they place. But so long as nonresidents are subjected to the same standards as residents, this goal provides no support for discrimination against nonresidents.[6]

Agents must be subject to the regulatory jurisdiction of the Commissioner, but all agents licensed by the Commissioner are subject to his jurisdiction; where the agents reside does not matter. And even if proximity to the regulator made any significant difference—which it does not—the fact is that the Commissioner's office in Tallahassee is closer to Atlanta and Birmingham and New Orleans and many other cities outside Florida (whose residents, even if licensed by the Commissioner, cannot place insurance in Florida, unless accompanied by a Florida resident agent) than to Miami (whose residents, if licensed by the Commissioner, *can* place such coverage).

And finally, the Commissioner says a purchaser of insurance products benefits from having a "local" agent to whom it can turn for assistance, but this does not support the statutory discrimination against nonresidents, as confirmed by three incontrovertible facts. First, the notion that an agent cannot provide assistance outside his home state is nonsense; whatever may have been said when people traveled by horseback and communicated by regular mail, today people communicate by telephone and facsimile and e-mail and overnight courier, and they travel by jet; state boundaries pose no obstacle. Second, even if geographic proximity were important, the discrimination against Florida nonresidents is at once over- and under-inclusive; a customer in Pensacola may obtain coverage through an unaccompanied agent from Miami (more than 700 miles away), but not from an unaccompanied agent from Mobile (less than 50 miles away). Indeed, it is farther from Pensacola to Key West than from Pensacola to Indianapolis; erecting a fence at the Florida border does nothing to

---

**6.** A person who resides in Florida may be licensed as a "resident general lines agent." § 626.731(1)(b), Fla. Stat. A person who resides outside Florida may be licensed in Florida as a "nonresident agent." § 626.741(1)(a), Fla. Stat. The Commissioner makes no claim that the licensure requirements for nonresident agents are less rigorous than those for resident agents, nor does he claim that nonresident agents are less qualified in any respect than resident agents.

promote geographic proximity. And third—and perhaps most important—in many instances the purchaser of the insurance coverage at issue is not located in Florida at all, but in Atlanta or New York or California; it is the risk, not the purchaser, that is in Florida. If the goal of the statutes is to have an agent in the same location as the purchaser, the restrictions on Florida-licensed agents who live outside Florida cut in precisely the wrong direction.

In sum, no purpose is served by denying to Florida-licensed agents who live outside Florida the same rights and privileges afforded to Florida-licensed agents who reside within the state. The discrimination against nonresident agents is unconstitutional.

For these reasons,

IT IS ORDERED:

1. Plaintiff's motion for summary judgment (document 24) is GRANTED. Defendant's motion to dismiss or for summary judgment (document 15) is DENIED.

2. It is hereby declared that § 624.425, § 626.741, and § 626.927 of the Florida Statutes violate the Privileges and Immunities Clause and Equal Protection Clause of the United States Constitution to the extent that they deny to Florida-licensed nonresident insurance agents the same rights and privileges that they afford to Florida-licensed resident agents.

3. The Defendant Florida Commissioner of Insurance, in his official capacity, is enjoined from denying to Florida-licensed nonresident agents the same rights and privileges that Florida-licensed resident agents possess under § 624.425, § 626.741, and § 626.927 of the Florida Statutes.

4. Nothing in this order affects the right and ability of the Defendant Florida Commissioner of Insurance to enforce against Florida-licensed nonresident agents all the same requirements imposed on Florida-licensed resident agents under the same circumstances.

5. This order is binding on the Florida Commissioner of Insurance and his officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

6. The clerk shall enter judgment. The judgment shall state that judgment is entered in favor of the Plaintiff Council of Insurance Agents + Brokers against the Defendant Florida Commissioner of Insurance in his official capacity. In addition, the judgment shall include the terms set forth in paragraphs 2 through 5 above.