**NATIONAL MINING ASSOCIATION, Plaintiff,**

v.

**Cathryn SLATER, et al., Defendants.**

**Cellular Telecommunications & Internet Association, Plaintiff,**

v.

**Cathryn Slater, et al., Defendants.**

**Nos. CIV. A. 00–00288 (ESH), CIV. A. 01–00404 (ESH).**

United States District Court, District of Columbia.

Sept. 18, 2001.

David G. Leitch, Gregory G. Garre, Catherine E. Stetson, Hogan & Hogan, L.L.P., Susan Virginia Cook, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for Plaintiff.

Stacy M. Ludwig, Daria Jean Zane, U.S. Attorney's Office, Silas R. DeRoma, U.S. Department of Justice Environmental & Natural Resources Div., Washington, DC, for Defendants.

Martin P. Willard, Perkins, Coie, LLP, Washington, DC, for Movant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

This case involves a challenge under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), to the Final Rule promulgated by the Advisory Council on Historic Preservation ("ACHP" or the "Advisory Council") pursuant to section 106 of the National Historic Preservation Act of 1966 ("NHPA" or the "Act"), 16 U.S.C. §§ 470—470w. Defendants have moved to dismiss on grounds of standing and ripeness. In the alternative, defendants have moved for summary judgment. Plaintiffs National Mining Association ("NMA") and Cellular Telecommunications & Internet Association ("CTIA") have cross-moved for summary judgment. Having considered the pleadings and the entire record therein, the Court finds that plaintiffs have standing to bring suit, and that the action is ripe for adjudication. In addition, the Court finds that two provisions of the Final Rule, 36 C.F.R. §§ 800.4(d)(2) and 800.5(c)(3) (2000), violate the plain language of the Act, and therefore grants plaintiffs' summary judgment motion in part. As to all other claims, summary judgment is granted for defendants.

## BACKGROUND

### I. The Parties

Plaintiff NMA is a non-profit trade association of the producers of most of America's coal, metals, and industrial and agricultural minerals; mineral processors; manufacturers of mining and mineral processing machinery, equipment, and supplies; and engineering and consulting firms, financial institutions, and various other groups serving the mining industry. Many NMA members conduct activities on or near properties affected by the Final Rule, including projects requiring federal or state permits, approvals, licensing, funding, or assistance.

Plaintiff CTIA is the international organization of the wireless communications industry for both wireless carriers and manufacturers. Membership in the organization covers all Commercial Mobile Radio Service ("CMRS") providers and manufacturers, as well as providers and manufacturers of wireless data services and products. Its members include Sprint PCS, Verizon Wireless, AT & T Wireless, Cin-

gular Wireless, VoiceStream Wireless, Qwest Wireless, and Nextel Communications. CTIA's members provide wireless telecommunications services via a nationwide network of towers and antennas. As Federal Communications Commission ("FCC") licensees, CTIA members are subject to FCC regulations that require compliance with the NHPA and the Advisory Council's regulations. 47 C.F.R. §§ 1.1301, *et seq.*

The twenty-member Advisory Council is an independent agency established pursuant to the Act. 16 U.S.C. § 470i. Eighteen members are appointed by the President, while the other two members—the Chairman of the National Trust for Historic Preservation and the President of the National Conference of State Historic Preservation Officers—are not. 16 U.S.C. §§ 470i(a)(7), (8). The Council's operations are governed by the APA. 16 U.S.C. § 470q. Defendant Cathryn Slater is the chair of the ACHP, and John Fowler is the Executive Director of the Council.

## II. The NHPA

In 1966, Congress passed the NHPA "to accelerate [the federal government's] historic preservation programs and activities, to give maximum encouragement to agencies and individuals undertaking preservation by private means, and to assist State and local governments [and] Indian tribes ... to expand and accelerate their historic preservation programs and activities." 16 U.S.C. §§ 470(b)(7), 470–1. Congress based the Act on a finding that "historic properties significant to the Nation's heritage [were] being lost or substantially altered, often inadvertently, with increasing frequency, [and that] the preservation of this irreplaceable heritage is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans ...." 16 U.S.C. §§ 470(b)(3)(4). The Act was intended to encourage historic preservation in the face of expanding "urban centers, highways, and residential, commercial, and industrial developments ...." 16 U.S.C. § 470(b)(5). Congress has amended the NHPA several times, including most recently in 1992.

Four provisions of the Act are particularly relevant to this action.

- Section 202 of the Act establishes the functions of the ACHP. It provides:

The Council shall -

(1) advise the President and the Congress on matters relating to historic preservation; recommend measures to coordinate activities of Federal, State, and local agencies and private institutions and individuals relating to historic preservation; and advise on the dissemination of information pertaining to such activities;

(2) encourage, in cooperation with the National Trust for Historic Preservation and appropriate private agencies, public interest and participation in historic preservation;

(3) recommend the conduct of studies in such areas as the adequacy of legislative and administrative statutes and regulations pertaining to historic preservation activities of State and local governments and the effects of tax policies at all levels of government on historic preservation;

(4) advise as to guidelines for the assistance of State and local governments in drafting legislation relating to historic preservation;

(5) encourage, in cooperation with appropriate public and private agencies and institutions, training and education in the field of historic preservation;

(6) review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under this subchapter; and

(7) inform and educate Federal agencies, State and local governments, Indian tribes, other nations and international organizations and private groups and individuals as to the Council's authorized activities.

16 U.S.C. § 470j(a).

- Section 106 of the Act sets out the requirements for federal agencies in considering the impact of a federally-funded or federally-assisted undertaking on historic preservation.

The head of any federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.[1] The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f.

- Section 211 of the Act authorizes the Advisory Council

"to promulgate such rules and regulations as it deems necessary to govern the implementation of [section 106 of the Act] in its entirety. The Council shall, by regulation, establish such procedures as may be necessary to provide for participation by local governments in proceedings and other actions taken by the Council with respect to undertakings referred to in [section 106] which affect such local governments."

16 U.S.C. § 470s.

- Finally, section 110 harmonizes the roles of the Council and the federal agencies with regard to the requirements of section 106. Section 110(a) mandates that all federal agencies ensure that their

procedures for compliance with [section 106] -

(i) are consistent with regulations issued by the Council pursuant to [section 211]

(ii) provide a process for the identification and evaluation of historic properties for listing in the National Register and the development and implementation of agreements, in consultation with State Historic Preservation Officers, local governments, Indian tribes, Native Hawaiian organizations, and the interested public, as appropriate, regarding the means by which adverse effects on such properties will be considered . . . .

16 U.S.C. § 470h–2(a)(2)(E). Section 110(k) prohibits federal agencies from funding or licensing projects for applicants who intend to avoid the requirements of section 106. 16 U.S.C. § 470h–2(k). And section 110(*l*) mandates that, when there is a disagreement between the federal

---

**1.** Established by section 101 of the Act, the National Register of Historic Places falls under the jurisdiction of the Secretary of the Interior and is "composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." 16 U.S.C. § 470a(a)(1)(A).

agency and the Council over the impact of an undertaking on an historic property, the head of that agency must document his or her decision.[2] 16 U.S.C. § 470h–2($l$)

### III. Section 106 Rulemaking

#### A. History

Since the NHPA was enacted, the Advisory Council has promulgated four sets of regulations to implement section 106 of the Act. The original regulations took effect in 1979. These were revised in 1986. A third set of rules was promulgated on May 18, 1999. In response to the 1999 Final Rule, the NMA filed the original complaint in this action. The ACHP then reopened the rulemaking proceedings and subsequently promulgated a fourth version of the Final Rule on December 12, 2000. This iteration went into effect on January 11, 2001, superseding the prior regulations in their entirety. 65 Fed.Reg. 77,698 (2000). Throughout the history of the section 106 rulemaking, the fundamental process that federal agencies must follow has remained largely unchanged. Agencies must identify historic properties and assess their significance, evaluate the impacts that their actions might have on these properties,

and seek alternatives to avoid or mitigate adverse effects. If they are unable to achieve this final step, the agencies must obtain the ACHP's comments. 36 C.F.R. pt. 800.

The 1999 Final Rule came about as a result of the 1992 amendments to the NHPA.[3] Following the amendments, the Advisory Council launched a review of its existing regulations to determine whether its section 106 procedures should be modified based on the changes to the Act. As part of its review, the ACHP queried participants in the section 106 process for their views of the existing system and for ways to improve it.[4] On October 3, 1994, the Council issued a Notice of Proposed Rulemaking (NOPR) and published the proposed regulations for comment. Notice of Proposed Rulemaking, 59 Fed.Reg. 50,-396 (1994). The Council received 370 comments in response to the proposed rules. Reaction to the proposed rules was mixed, with opponents emphasizing that the new regulations would impermissibly expand the Council's statutory role and unnecessarily complicate the section 106 process.[5] Members of Congress expressed displea-

---

**2.** 36 C.F.R. § 800.11 specifies the standards for this documentation, which must be sufficient "to enable any reviewing parties to understand [the] basis" for the determination. 36 C.F.R. § 800.11(a). For example, an agency finding with regard to adverse effects must include 1) a description of the undertaking, specifying the federal involvement and the area of potential effects; 2) a description of the steps taken to identify historic properties; 3) a description of the affected historic properties, including information on the characteristics that qualify them for inclusion in the National Register; 4) a description of the undertaking's effects on those properties; 5) an explanation of why the criteria for adverse effects were found applicable or inapplicable, including any conditions to avoid or minimize adverse effects; and 6) copies or summaries of any comments provided by consulting parties or the public. 36 C.F.R. § 800.11(e).

**3.** Most notably, Congress amended section 211 of the Act by adding the phrase "in its entirety" to the first sentence. 16 U.S.C. § 470s.

**4.** These participants included federal agencies, SHPOs, state and local governments, applicants for federal assistance, Native Americans, preservation organizations, independent contractors, and members of the public.

**5.** *See, e.g.,* Administrative Record ("A.R.")– 00192 (Department of the Navy); A.R.–00254 (Department of Agriculture); A.R.–00392 (Oklahoma Historical Society); A.R.–00673 (Illinois Department of Mines and Minerals, Land Reclamation Division); A.R.–00801 (State of Wyoming, Office of the Governor).

sure with the proposed rules in reports on H.R.1977, the fiscal year 1996 appropriation legislation for the Department of the Interior. The House Report stated, "The council has no authority to unilaterally alter Federal actions that will affect historic properties nor ... impose solutions on non-Federal parties." H.R.Rep. No. 104–173, at 110 (1995). The Senate Appropriations Committee noted that the ACHP "does not have responsibility for ... overriding other Federal agencies' decisions." S.Rep. No. 104–125, at 104 (1995).[6]

The Council subsequently abandoned the proposed regulations. In May 1995, the ACHP convened focus groups comprised of representatives of many of the parties who had commented on the October 1994 proposed rules. After considering the views of the focus groups, the Council published a revised set of regulations for comment on September 13, 1996. Notice of Proposed Rulemaking, 61 Fed. Reg. 48,580 (1996). After more comments, consultations, revisions, and approval by the necessary parties within the federal government, the Final Rule was published on May 18, 1999 and went into effect one month later.

On February 15, 2000, NMA filed a lawsuit challenging the 1999 Final Rule. As part of the complaint, NMA attacked the

regulations under the Appointments Clause of the Constitution, U.S. Const. art. II, § 2, cl. 2, because of the participation in the promulgation of the Rule by the two members of the ACHP who had not been appointed by the President.[7] In light of this potential procedural problem, the Council again commenced the rulemaking process, using the text of the 1999 Rule as the proposed regulation. The ACHP received 59 comments on its proposal. After considering the comments, the Council voted to adopt the draft rule as a final rule, and on December 12, 2000, it promulgated the regulations at issue in this litigation.

## B. The Final Rule

To achieve its goal of "accommodat[ing] historic preservation concerns with the needs of Federal undertakings," the Final Rule "requires Federal agencies to take into account the effects of their undertakings on historic properties and afford the Council a reasonable opportunity to comment on such undertakings. The procedures in [the Final Rule] set forth how Federal agencies meet these statutory responsibilities." 36 C.F.R. § 800.1(a). Under these procedures, an agency must first determine whether it is involved in an undertaking. 36 C.F.R. §§ 800.3(a), 800.16(y). If the agency decides that it is

---

**6.** Leaders in Congress during this period were critical of the Advisory Council's efforts to modify the section 106 process. In November 1996, when the Council was reauthorized by Congress, the House and Senate managers noted that "in the recent past, the Advisory Council has attempted to promulgate regulations which could have led to significant increases in the cost of compliance with the [NHPA] and which would have provided little additional benefit in terms of resource protection." H.R. Conf. Rep. No. 104–836, at 210 (1996).

**7.** The Appointments Clause provides that the President

shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. Because these two members of the Council are added to the group *ex officio* by the terms of the Act rather than by appointment, plaintiffs alleged that their participation in the promulgation of the regulations violated the Appointments Clause.

involved in an undertaking, it must then determine whether the action has the potential to affect historic properties. 36 C.F.R. § 800.3(a)(1).[8] If so, the agency must then consult with the appropriate State Historic Preservation Officer ("SHPO") or Tribal Historic Preservation Officer ("THPO")[9] and identify the historic properties that are potentially affected by the undertaking. *Id.* at §§ 800.4(a)-(b). If the agency determines that no historic properties are present or that the undertaking will not affect any historic properties, it must document that finding and provide it to the SHPO, as well as notify the public. If there is no objection to the proposed finding, the section 106 process is complete. *Id.* at § 800.4(d)(1).

Several of the provisions of the Final Rule that regulate the section 106 process itself are pertinent to plaintiffs' challenges. Section 800.2 governs the participants in the section 106 process, requiring federal agencies to consult with SHPOs, THPOs, local government representatives, members of the public, and other interested parties before taking any action on an undertaking. *See* §§ 800.2(a)(4) & (c). Section 800.3 regulates the initiation of the section 106 process. This provision requires agencies to determine whether the project is an undertaking, identify the parties that must be consulted, and develop a plan for involving the public in the process. *See* §§ 800.3(a), (c), (e). Section 800.4 governs identification of historic properties by compelling agencies to consult with SHPOs and THPOs to identify existing and potential historic properties. *See* § 800.4. Section 800.5 focuses on the assessment of adverse effects of the under-

taking. Under section 800.5, "[a]n adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property . . . in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." § 800.5(a)(1). In addition, agencies are required to consult with SHPOs, THPOs, and other interested parties concerning the adverse effects on the historic properties that have been identified. *See* § 800.5. Section 806 governs the resolution of adverse effects, including procedures for developing alternatives or modifying undertakings to avoid adverse effects. Section 800.6(b) authorizes—and in some instances requires—Council participation in this process, while section 800.6(c) mandates that agencies execute a "memorandum of agreement" for submission to the ACHP as evidence that they have complied with the requirements of section 106. Any failure to resolve these adverse effects is governed by section 800.7, which in some cases requires that the Council comment on the matter, though these comments are non-binding. *See* § 800.7(a).

The Final Rule also gives the Council power to review the procedures and actions of the agencies. Under section 800.9, the Council is authorized to review an agency's compliance with section 106 of the NHPA. "Where an agency official has failed to complete the requirements of section 106 in accordance with the procedures in this part prior to the approval of an undertaking, the Council's opportunity to comment may be foreclosed. The Council may review a case to determine whether a

---

**8.** "Historic property," "undertaking," and other relevant terms are defined in 36 C.F.R. § 800.16.

**9.** The SHPO is the official designated pursuant to section 101(b) of the Act to administer the state historic preservation program. 36

C.F.R. § 800.16(v). The THPO is the tribal official appointed by the tribe's "chief governing authority" to assume responsibility for the SHPO on tribal lands. 36 C.F.R. § 800.16(w).

foreclosure has occurred." § 800.9(b). If the Council determines that foreclosure has occurred, it will transmit the determination to the agency, and will also make the determination available to the public and parties known to be interested. *Id.* Section 800.14 permits agencies to develop their own procedures to implement section 106 pending approval of the ACHP. § 800.14(a)(1). "If the Council finds the procedures to be consistent with this part, it shall notify the agency official and the agency official may adopt them as final alternate procedures." § 800.14(a)(2).[10] The Final Rule thus grants the Council power to define and participate in the section 106 process, as well as to review agency compliance with that process.

## LEGAL ANALYSIS

Defendants have moved to dismiss on the grounds that plaintiffs lack standing to bring this action and because the matter is not ripe for adjudication. Alternatively, they have moved for summary judgment, and plaintiffs have filed a cross-motion for summary judgment.

### I. Standing

■ The question of standing involves both constitutional limitations on federal court jurisdiction, as well as prudential limitations on its exercise.[11] *Bennett v.*

*Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Article III constitutional standing limits judicial intervention to genuine disputes between adverse parties which are " 'in a form . . . capable of judicial resolution,' " *Florida Audubon Society v. Bentsen,* 94 F.3d 658, 663 (D.C.Cir. 1996) (quoting *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)), and therefore, it " 'is an essential and unchanging' predicate to any exercise of [federal] jurisdiction." *Id.* (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). To meet the constitutional requirement of standing, a plaintiff must show: (1) he has suffered an injury which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Plaintiff bears the burden of proving standing. *Id.* Defendant attacks plaintiffs' standing under each of the three prongs of the *Lujan* test.[12]

### A. Injury In Fact

■ Defendants first argue that plaintiffs do not demonstrate concrete or particularized injuries that are actual or im-

---

10. This provision replaces the more flexible approach to the implementation of the section 106 process that was in the previous Final Rule, which provided that "[t]he Council recognizes that the procedures for the agency official set forth in these regulations may be implemented by the agency official in a flexible manner reflecting differing program requirements, as long as the purposes of section 106 of the [NHPA] and these regulations are met." (A.R.–92–00021.)

11. Defendant does not challenge plaintiff's prudential standing.

12. Both plaintiffs are associations comprised of individual members. An association has standing to sue on behalf of its members as long as (1) its members have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Defendants do not challenge plaintiffs' standing to bring suit on behalf of their members.

minent. This argument is without merit. The Declaration of Bradford V. Frisby ("Frisby Decl.") explains that "NMA's members are currently involved in mining projects or activities that are being subjected to the consultation and review process established by the Council's regulations." (Frisby Decl. ¶ 4.) The consequences of the Final Rule include delays in obtaining mining permits and added costs in complying with the new section 106 process. *Id.* ¶ 5. Plaintiff CTIA has suffered similar injuries. Its members have also encountered delays and added costs in tower siting and construction as a result of the new requirements of the Final Rule, and in some instances, these projects have been halted because of the new regulations. *See, e.g.,* AR D–01040–01043 (Verizon Wireless); AR D–00925–00930 (Sprint PCS); AR D–00934–00947 (Letter from Delaware SHPO to Sprint PCS transmitting checklist of more than 40 steps needed for compliance with new section 106 procedures). These types of injuries—delay, cost, and expensive uncertainty—are sufficient to meet the injury-in-fact requirement. *National Mining Ass'n v. Department of the Interior,* 70 F.3d 1345, 1349 (D.C.Cir.1995); *Association of American Railroads v. DOT,* 38 F.3d 582, 586 (D.C.Cir.1994); *National Coal Ass'n v. Lujan,* 979 F.2d 1548, 1552 (D.C.Cir.1992).

### B. Causal Connection

Next, defendants argue that plaintiffs' injuries are not fairly traceable to the Final Rule because the regulations are procedural and do not impose any substantive requirements on federal agencies. Any injuries that plaintiffs allege, defendants contend, are caused by the substantive requirements of the NHPA as implemented by the federal agencies with jurisdiction over plaintiffs' activities, rather than by the Final Rule.

■ Defendants misinterpret the "fairly traceable" test. Under this standard, the defendants' actions need not be the final step in the chain of causation that leads to the harm suffered by plaintiffs. While "it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett,* 520 U.S. at 169, 117 S.Ct. 1154 (internal quotation and citation omitted). In fact, "the causation element is satisfied by a demonstration that an administrative agency authorized the injurious conduct." *America's Cmty. Bankers v. FDIC,* 200 F.3d 822, 827 (D.C.Cir.2000). It is immaterial whether the intermediary that directly causes the injury is a public entity or a private one. *See Building Industry Ass'n v. Babbitt,* 979 F.Supp. 893, 899 (D.D.C.1997) (causation prong in suit against Department of the Interior satisfied because Department's decision to list three species of shrimp as endangered "had significant effects on the Army Corps of Engineers and the various regulatory entities that govern land use in California, which in turn ... forced plaintiffs to incur costs and delays"). Here, the challenged Final Rule affects the procedures of the agencies, such as the FCC, to which plaintiffs must apply for permits and approvals. As plaintiffs' declarations demonstrate, these procedures have led to additional cost and delay for plaintiffs. These injuries are therefore fairly traceable to the action of defendants in promulgating the Final Rule.

### C. Redressibility

■ Defendants also argue that plaintiffs' injuries are not redressible by a finding in their favor in this action. Defendants contend that even if the Final Rule were vacated, plaintiffs would still be sub-

ject to the requirements of the NHPA, and therefore, would still face costs and delays from the section 106 process. This argument misconstrues both the nature of plaintiffs' lawsuit and the redressibility standard. Plaintiffs' have challenged the requirements for the section 106 process that were implemented by the Final Rule—not section 106 of the NHPA. Moreover, "[w]here an agency rule causes the injury, the redressibility requirement may be satisfied as well by vacating the challenged rule and giving the aggrieved party the opportunity to participate in a new rulemaking, the results of which might be more favorable to it." *America's Cmty. Bankers*, 200 F.3d at 828–29; *see Lepelletier v. FDIC*, 164 F.3d 37, 43 (D.C.Cir. 1999). A finding for plaintiffs would therefore redress the injuries they allege in this suit.

## II. Ripeness

■ Defendants next argue that the action should be dismissed because it is not ripe for review. A case brought under the APA is ripe for adjudication if the issues are fit for judicial determination and withholding consideration would create hardship for one or more of the parties. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

■ This action satisfies both prongs of the *Abbott* test. For an issue to be "fit" for decision, it must be purely legal in nature and must represent a "final agency action." *Id.* For a claim to be considered "purely legal," the validity of the agency's exercise of authority should not vary based upon the facts of the case. *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 751 (D.C.Cir.1987) (Green, J., writing separately.) Further, the regulation at issue

should not be treated as "informal" or the mere ruling of a subordinate official. *Abbott*, 387 U.S. at 151, 87 S.Ct. 1507. In this case, the ACHP has issued a Final Rule, meaning that its procedures are now established. The issue is therefore "sufficiently fleshed out to allow the court to see the concrete effects and implications of its decision." *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C.Cir.1995) (internal citations omitted); *see Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d 43, 51 (D.C.Cir.1999) (challenge to issuance of agency's final rule is ripe when there was no possibility that agency action would alter the claim).

In addition, withholding adjudication would impose significant hardship on the plaintiffs. This is a case where "regulations purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business" of the plaintiffs. *Abbott*, 387 U.S. at 152, 87 S.Ct. 1507. The Final Rule subjects plaintiffs to a complex and multilayered review process before they can obtain the permits that are required for their undertakings.[13] (*See* Frisby Decl. ¶ 5; Declaration of James Magro ¶¶ 2, 4–6, 10–11, 13; Declaration of John M. Demichiei ¶¶ 6–14.) As noted, this leads plaintiffs to suffer increased costs and delays. This is sufficient to "impose an immediate, significant burden" on plaintiffs and establish that the matter is ripe for review. *American Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 297 (5th Cir.1998).

## III. Summary Judgment

### A. Standard of Review for Plaintiffs' APA Claims

Both plaintiffs have moved for summary judgment. A party is entitled to summary

---

**13.** Under the Surface Mining Control and Reclamation Act, for example, no person may engage in any surface coal mining operation without first obtaining a permit. 30 U.S.C. § 1256. Similarly, CTIA members are FCC licensees subject to that agency's regulations requiring compliance with the Final Rule of the Advisory Council.

judgment where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is an appropriate mechanism for resolving cases involving administrative rulemaking on the record, particularly where, as here, the case turns chiefly on issues of statutory construction. *See Troy Corp. v. Browner,* 120 F.3d 277, 281 (D.C.Cir.1997).

Plaintiffs have challenged the regulations under a host of theories. Most of plaintiffs' claims have been brought under the APA. First, NMA argues that the Final Rule exceeds the Council's statutory authority because it 1) contains substantive regulations that govern federal agencies, SHPOs, and other parties; 2) implements parts of the Act other than section 106; and 3) is inconsistent with other sections of the NHPA.[14] Therefore, plaintiff argues, the Final Rule conflicts with the plain language of the Act and is not a reasonable and permissible construction of the statute.

Second, NMA contends that the Final Rule impermissibly expands section 106 to affect state and local government activities that are not federal undertakings. Plaintiffs appear to argue that this action of the ACHP violates the plain language of the statute and is an arbitrary and capricious expansion of section 106.

Third, NMA argues that the regulations require federal agencies to determine the eligibility of unidentified properties for the National Register, in violation of the Act. This, according to plaintiffs, violates the plain language of the statute, is not a reasonable construction of the Act, and is arbitrary and capricious.

Fourth, NMA asserts that the Rule is invalid because of its regulations governing the treatment of the historic properties of Indian tribes. Plaintiffs argue that the ACHP has no authority to promulgate regulations regarding Indian tribes, and that even if it does, the Final Rule expands the role of the tribes beyond that intended by Congress. Plaintiff contends that this violates the plain language of the NHPA.[15]

CTIA has challenged the Final Rule under several additional theories. CTIA contends that the regulations violate the NHPA because under the statute, the responsibility for determining whether an undertaking complies with the requirements of the Act—and section 106 in particular—falls to the agencies. According to plaintiff, the ACHP has unlawfully usurped this role by mandating federal agency compliance with Council-imposed procedures and vesting in the Council the authority to make critical decisions pursuant to section 106. CTIA also argues that the Final Rule deprives federal agencies of the ability to balance historic preservation with other policies, as is required by law. For these reasons, CTIA argues that the Final Rule 1) violates the plain language of the Act; 2) is an unreasonable interpretation of any ambiguous language in the NHPA; and 3) is arbitrary and capricious.

---

**14.** CTIA has incorporated all of NMA's arguments by reference.

**15.** NMA also contends that the regulations are unconstitutional for three reasons. First, it argues that the Final Rule's criteria for identifying adverse effects are unlawfully vague and overbroad, and therefore violate due process of law. Second, NMA asserts that the Final Rule grants special treatment to the religious practices of Native Americans and Hawaiians, in violation of the Establishment Clause of the First Amendment. Third, plaintiff contends that the Appointments Clause of the Constitution prohibits the Council from exercising the regulatory powers it has delegated to itself, because two of the twenty members of the ACHP are not appointed by the President.

Finally, CTIA contends that the regulations irreconcilably conflict with other federal statutes, such as the Communications Act of 1934, 47 U.S.C. § 151, *et seq.*

### B. *Chevron*

Claims under 5 U.S.C. § 706(2)(C) that contest an agency's construction of a statute it administers are ordinarily subject to the standard of review articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which mandates a two-step process. First, a court considers whether Congress spoke directly to the question at issue: if so, "that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, however, the statute is unclear, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. In answering that question, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844, 104 S.Ct. 2778. The rationale for this deference is that the agency's decision as to the meaning of the statute involves "reconciling conflicting policies and a full understanding of the force of the statutory policy ... [and] depend[s] upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Id.* In short, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

### C. Arbitrary and Capricious

█ Plaintiffs also challenge the regulations under the "arbitrary and capricious" standard of the APA, which requires the Court to review whether the agency actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Challenges under § 706(2)(C)—which follow the test set forth in *Chevron*—are directed primarily at the decision of the agency, whereas § 706(2)(A) actions focus mainly on the decision-making process and rationale behind the agency's action. *Michigan v. EPA*, 213 F.3d 663, 682 (D.C.Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1225, 149 L.Ed.2d 135 (2001). While the standards of review for these types of challenges overlap, they are not identical; an agency's interpretation may survive analysis under *Chevron*, but it can still be struck down as arbitrary and capricious. *American Petroleum Inst. v. EPA*, 216 F.3d 50, 57–58 (D.C.Cir.2000); *Michigan v. EPA*, 213 F.3d at 682.

In reviewing the action of the agencies under § 706(2)(A), a court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), to determine whether the agencies have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action...." *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "In thoroughly reviewing the agency's actions, the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C.1995) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park*, 401 U.S. at 415–16, 91 S.Ct. 814; *Profes-*

*sional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216, 1220 (D.C.Cir.1983)).

 Conclusory statements are insufficient to meet this requirement. *Dickson v. Secretary of Defense,* 68 F.3d 1396, 1405 (D.C.Cir.1995). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43, 103 S.Ct. 2856. The scope of review under this standard, however, is narrow, and a court is not to substitute its view for that of the agency. *Id.* Moreover, an agency's decision must be upheld under this standard "if the agency's path may reasonably be discerned" and will only be reversed where "there has been a clear error of judgment." *Id.* (citations omitted).

## IV. Plaintiffs' APA Claims

Having set forth the relevant standards of review under the APA, the Court turns to plaintiffs' arguments for invalidating the Final Rule.

### A. Substance vs. Procedure

#### 1. The Scope of the Council's Authority

The gravamen of plaintiffs' complaint can be simply stated: did the ACHP exceed the scope of its authority under the Act? To answer that question, the Court must first determine that scope. Significantly, NMA and the Council appear to agree that the Act empowers the Council only to issue procedural regulations regarding the section 106 process, and that it may not promulgate substantive regulations under the NHPA. (Def. Opp. at 27; NMA Reply at 6.) CTIA appears to adopt a more extreme approach, arguing that the ACHP lacks the authority to issue binding procedural regulations governing the section 106 process, but may only promulgate non-binding guidelines.

Several sections of the NHPA are relevant to determining the scope of the Council's authority. Section 202 establishes the functions of the ACHP. Under that provision, for example, the ACHP may advise the President and Congress on matters relating to historic preservation, review the policies and programs of federal agencies in order to make recommendations for how to make them consistent with the NHPA, advise state and local governments in drafting legislation relating to historic preservation, and inform federal agencies and other public and private groups "as to the Council's authorized activities." 16 U.S.C. § 470j(a). Section 202 defines the Council's role as that of a consultant, and does not grant the Council any power to promulgate regulations that bind federal agencies. But section 202 also does not prohibit the Council from issuing binding regulations, nor does it limit its duties to those enumerated in that provision.

The next relevant provision, section 211, was not part of the original NHPA, but was added by amendment in 1976. Until 1992, that provision gave the Advisory Council the power "to promulgate such rules and regulations as it deems necessary to govern the implementation of [section 106] . . . ." 16 U.S.C. § 470s (amended 1992). This version of section 211 may have limited the Council's rulemaking authority to issuing regulations relating to its own opportunity to comment on the effect of a federal undertaking on historic preservation. (Def. Opp. at 25; MTA Reply at 5.) In 1992, section 211 was amended by

adding the phrase "in its entirety" to describe the scope of the Council's authority to govern the implementation of section 106. 16 U.S.C. § 470s. This amendment expanded the Council's power beyond the implementation of its own commenting role. Finally, section 110 mandates that federal agencies must ensure that their procedures for compliance with section 106 are consistent with the regulations issued by the Council pursuant to section 211. 16 U.S.C. § 470h–2(a)(2)(E).

### a. *Chevron* Step One

■ Under step one of *Chevron*, the Court must first determine whether these provisions of the NHPA speak directly to the scope of the Council's authority to implement section 106. "[W]hen a statute is clear and unambiguous, consideration of administrative interpretation contrary to such language is inappropriate; the agency cannot by its interpretation, override the congressional will as memorialized in the statutory language." *Mylan Pharm., Inc. v. Henney,* 94 F.Supp.2d 36, 47 (D.D.C.2000) (internal quotations omitted). "Under the first step of Chevron, the reviewing court must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Bell Atlantic Telephone v. FCC,* 131 F.3d 1044, 1047 (D.C.Cir.1997) (internal quotations omitted). CTIA argues that the language of the Act is clear, and that the Council's role under the statute is purely advisory, with no authority to require federal agencies to conduct reviews under section 106 in any particular manner. In response, defendants emphasize that the plain language of the statute grants the Council the power to promulgate any regulations that are necessary to govern the section 106 process. The Court finds the latter interpretation to be compelling.

■ To determine the meaning of the statute, the Court looks to its language, structure, and legislative history. "The first traditional tool of statutory construction focuses on the language of the statute." *Bell Atlantic,* 131 F.3d at 1047. CTIA argues that the language of the statute vests sole authority to implement compliance procedures and make determinations relating to section 106 in the federal agencies. Under this interpretation, section 106 grants no powers to the Council, and imposes only limited obligations on the agencies. CTIA contends that under section 110, the responsibility for ensuring compliance with section 106 rests entirely with the agencies, which are required to ensure that their section 106 procedures are "consistent with regulations issued by the Council ...." 16 U.S.C. § 470h–2(a)(2)(E). Moreover, plaintiff argues that section 202 of the Act limits the scope of the Council's powers to those that are purely advisory, which it contends complements the duties of federal agencies to provide the Council with the opportunity to comment with respect to those agencies' section 106 determinations and policies.

In contrast, defendants argue that Congress' use of the phrases "govern the implementation," "as it deems necessary," and "in its entirety" in section 211 gives the Council the authority to pass whatever procedural regulations it deems appropriate to implement the section 106 process— including rules that are binding on federal agencies. The plain meaning of these phrases supports defendants' contention. First, the statute's grant of authority to the Council to promulgate regulations "govern[ing] the implementation" of section 106 strongly implies a grant of binding authority. The word "govern," as defendants note, is synonymous with a mandate rather than a suggestion, for it is a term commonly used to indicate a binding condi-

tion. For instance, both the Supreme Court and this Circuit have consistently used "govern" to describe a rule that it is required to follow. *See, e.g., INS v. Cardoza–Fonseca,* 480 U.S. 421, 430, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("Of course, this reasoning, based in large part on the plain language of § 243(h), is of no avail here since § 208(a) expressly provides that the 'well-founded fear' standard governs eligibility for asylum."); *Willoughby v. Potomac Electric Power Co.,* 100 F.3d 999, 1002 (D.C.Cir.1996) ("The plain language of the provision upon which Willoughby relies, however, manifests that the right of PEPCO employees to be protected from claims governs claims by the class action plaintiffs only, not personnel actions by PEPCO."). In addition, Congress' use of the phrases "in its entirety" and "as it deems necessary" implies that the Council has the ability to promulgate regulations governing how agencies implement section 106. The plain language of the statute therefore supports the interpretation that the ACHP's authority encompasses the promulgation of binding procedural regulations.

An examination of the statute in its entirety also supports this interpretation. "In determining whether Congress has specifically addressed the question at issue, the court should not confine itself to examining a particular statutory provision in isolation. Rather, it must place the provision in context, interpreting the statute to create a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson,* 529 U.S. 120, 121, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). The central focus of CTIA's argument concerning the scope of the Council's authority is its attempt to show that the defendants' inter-

pretation of section 211 is inconsistent with other provisions of the statute. CTIA contends that, given the language of sections 202 and 110(a)(2)(E), it is clear that the Council has no power to issue regulations that bind federal agencies. This argument is unpersuasive.

First, CTIA contends that the Council's authority is limited to the duties delineated in section 202, which are limited to the duty to "advise," "recommend," "encourage," "review," "inform," and "educate." While this provision does describe several of the ACHP's responsibilities as non-binding, it does not limit the functions of the Council in the manner suggested by plaintiff. In addition, the 1992 amendment to section 211 expanded the responsibilities of the ACHP. Second, CTIA focuses on section 110(a)(2)(E), which requires federal agencies to ensure that their section 106 procedures are consistent with the Council's regulations.[16] CTIA interprets this provision to mean that the onus for regulating the section 106 process falls entirely on the agencies: "As such, the 'rules and regulations' contemplated by Section 211 cannot 'implement' Section 106, nor can they bind the federal agencies' implementation of Section 106." (CTIA Opp. at 26.) This interpretation is illogical. In fact, defendants' construction of section 106 meshes perfectly with section 211—because the Council has the power to issue binding procedural regulations under section 106, it makes sense that the agencies must ensure that their procedures are consistent with these rules. Simply put, were the Council's regulations non-binding, there would be no purpose to a requirement that agency regulations have to conform to the ACHP's rules.

---

**16.** This provision was also added to the NHPA as part of the 1992 amendments. 16 U.S.C. § 470h–2(a)(2)(E)(i).

Finally, the Court notes that an examination of "the history, structure, and underlying policy purpose of the statute," *Bell Atlantic*, 131 F.3d at 1048, supports defendants' interpretation. The legislative history of the 1992 amendments demonstrates Congress' intent to give the ACHP the power to implement binding regulations governing the section 106 process. The amended language was added to "make[ ] clear that the ACHP has the authority to define not only how agencies will afford the Council a reasonable opportunity to comment, but also how agencies should take effects on historic properties into account in their planning." 137 Cong. Rec. S6609 (March 19, 1991). The Senate Report on the amendments echos this, emphasizing "that it is the responsibility of the Advisory Council to promulgate such rules and regulations it deems necessary to govern the implementation of section 106 of NHPA in its entirety." S.Rep. No. 102–336, at 17 (1992). These statements are consistent with defendants' interpretation—i.e., the Council is authorized under the statute to issue procedural regulations governing the section 106 process that are binding on federal agencies.[17] Under the plain meaning of the statute, therefore, the Council has the power to promulgate binding procedural regulations governing the section 106 process.[18]

### 2. Are the Regulations Substantive or Procedural?

The next question, therefore, is whether the Council has exceeded its authority under the Act by issuing regulations that are substantive, and not just procedural.[19]

---

17. The cases cited by CTIA to counter this interpretation are inapposite. Most of these cases predate the 1992 amendments to the Act. *E.g., Waterford Citizens' Ass'n v. Reilly,* 970 F.2d 1287, 1290–91 (4th Cir.1992); *Vieux Carre Property Owners v. Brown,* 948 F.2d 1436, 1447 (5th Cir.1991); *Illinois Commerce Comm'n v. ICC,* 848 F.2d 1246, 1260–61 (D.C.Cir.1988). CTIA's use of these pre-amendment cases in support of its position is extremely misleading. Other cases cited by CTIA stand only for the' proposition that the Advisory Council has no authority to promulgate substantive regulations, which defendants do not contest. *E.g., Concerned Citizens Alliance, Inc. v. Slater,* 176 F.3d 686, 695–96, (3d Cir.1999); *Lesser v. City of Cape May,* 110 F.Supp.2d 303, 307 (D.N.J.2000). Moreover, because defendants' authority to promulgate binding procedural regulations stems from the plain language of the statute, the Final Rule is not arbitrary and capricious in this respect.

18. NMA and defendants write extensively about a 1983 Opinion by the Department of Justice Office of Legal Counsel ("OLC") regarding the authority of the Advisory Council to promulgate regulations implementing section 106. Given the agreement between these parties on the scope of the ACHP's authority under the 1992 amendments, the OLC Opinion is largely irrelevant. In that Opinion, which is not binding on this Court, the OLC found that there was "no statutory support for regulations which effectively compel an agency to negotiate and reach agreement with the Advisory Council and its staff as a condition of pursuing its otherwise authorized activities." OLC Op. at 38, Administrative Record D–403. This concern, however, is not implicated by the Final Rule, since as concluded herein, the regulations do not require an agency to cede its authority to the Advisory Council. The OLC also concluded that the Council had no authority to issue substantive regulations that were binding on federal agencies. *Id.* at 36. But since it is clear that the ACHP's authority under the Act following the 1992 amendments extends only to issuing procedural regulations, the OLC Opinion does not assist the Court's analysis of the issues presented here.

19. This is not to be confused with the APA's distinction between substantive and procedural rules, 5 U.S.C. § 553. Under that provision, "[a]lthough federal agencies ordinarily must provide the public with notice of a proposed rule and the opportunity to submit comments on it, the APA makes exception for, among others, 'rules of agency organization, procedure, or practice.' " *James V. Hurson Assocs. v. Glickman,* 229 F.3d 277, 280 (D.C.Cir.2000) (quoting 5 U.S.C.

Defendants contend that the Rule is purely procedural, citing to its Preamble as support for this argument:

> Nowhere does the rule impose an outcome on a Federal agency as to how it will decide whether or not to approve an undertaking, or how. The rule merely provides a process that assures that the Federal agency takes into account the effects of the undertaking on historic properties. It does not impose in any way whatsoever how such consideration will affect the final decision of the Federal agency on the undertaking. The rule does not provide anyone with a veto power over an undertaking.

65 Fed.Reg. 77,698, 77,715 (Dec. 12, 2000). NMA disagrees, and has identified numerous provisions that it contends are substantive in nature, arguing that "as their terms infect the Final Rule in its entirety, the rule should be vacated in its entirety · and the Council directed to try again—this time conforming with its implementing statute." (NMA Reply at 10.)

■ "Except at the extremes, the terms 'substance' and 'procedure' precisely describe very little except a dichotomy, and what they mean in a particular context is largely determined by the purposes for which the dichotomy is drawn." *Sun Oil Co. v. Wortman,* 486 U.S. 717, 726, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988). Distinguishing between rules that are substantive and those that are procedural is often difficult, particularly because "procedure impacts on outcomes and thus can virtually always be described as affecting substance." *JEM Broadcasting Co. v.*

*FCC,* 22 F.3d 320, 326 (D.C.Cir.1994). However, this unenviable task must be undertaken, and although the parties have provided little assistance in fleshing out the meaning of these terms, the Court finds guidance in this Circuit's analysis in the field of labor law. In *Dep't of the Treasury v. Federal Labor Relations Authority,* 857 F.2d 819 (D.C.Cir.1988), the Court addressed whether a proposal put forth by a union of federal employees was procedural, requiring the agency to negotiate with the union, or was substantive and therefore non-negotiable. The Court reiterated the difficulties in distinguishing substance from procedure, *id.* at 821, but proceeded to define its own test for drawing the line in the FLRA context.

> On the one hand, ... some proposals are purely procedural. As they do not specify the criteria pursuant to which substantive decisions are to be made, they are negotiable unless their effect is to prevent management from "acting at all." On the other hand, ... some proposals "stand close to the uncertain border between procedure and substance" and should not be considered negotiable procedures if they would "directly interfere" with management's exercise of a reserved right.

*Id.* at 821 (quoting *Dep't of Defense v. FLRA,* 659 F.2d 1140, 1152–53, 1159 (D.C.Cir.1981)) (internal citations omitted). Under this "acting-at-all/directly interferes" test, a proposal is substantive only if it prevents the agency from acting at all or directly interferes with that agency's exercise of a right.[20]

---

§ 553(b)(3)(A)). This exception, however, is limited to rules governing an agency's own procedures, and is not at issue here.

**20.** Using this framework, the Court in *Department of the Treasury* reversed the ruling of the FLRA on a proposal requiring agency employees to receive first consideration for vacan-

.cies. The FLRA had found that the proposal was procedural "because at most, it would merely result in a delay in management's exercise of its right to choose employees." *Id.* at 820. The Circuit disagreed, holding that because the proposal delayed part of the hiring process, it inhibited management's

This test can be applied to the provisions of the ACHP's Final Rule that have been challenged by plaintiffs. Under section 106, each federal agency is required to "take into account the effect" of that agency's undertaking on any property that is included in or eligible for inclusion in the National Register. 16 U.S.C. § 470f. This, therefore, is both the duty and the right that Congress has explicitly delegated to each federal agency. Any regulation by the Council that directly interferes with that right, or prevents the agency from acting in furtherance of that duty, would be substantive and consequently invalid, because it violates the plain language of the statute. Other regulations are procedural and do not exceed the scope of authority granted to the Council under the NHPA.

■■■■■ Applying this framework, the Court finds that many of the challenged regulations are procedural and not substantive. Rule 800.2(b)(1) permits the Council to enter the section 106 process when it "determines that its involvement is necessary to ensure that the purposes of section 106 and the act are met." 36 C.F.R. § 800.2(b)(1). Rule 800.2(d) requires public participation in the section 106 process by instructing an agency to "seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties ... and the relationship of the Federal involvement to the undertaking." 36 C.F.R. § 800.2(d). Section 800.6(a) compels agency officials "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. § 800.6(a).[21] Section 800.7(c)(1) mandates that agency officials set up onsite "inspections" at the request of the Council. None of these rules is substantive. While these provisions contribute to the procedural complexity of the section 106 process by requiring consultation with interested parties or inspection of the site in question—and may ultimately delay approval of an undertaking, they do not directly interfere with the agency's ultimate decision on the undertaking, nor do they impose limitations that prevent the agency from acting at all. As the Circuit noted, "we have persistently held that proposals do not forfeit their procedural status simply by delaying the exercise of a management right." *Dep't of the Treasury*, 857 F.2d at 822.

---

ability to look beyond the agency for potential employees, thus narrowing the universe of candidates that the agency could consider, in violation of the agency's right under the Federal Service Labor–Management Relations Act, 5 U.S.C. §§ 7101–7135 (1982).

**21.** NMA contends that this provision conflicts with 16 U.S.C. § 470h–2(f), which subjects only National Historic Landmarks to the "minimize" requirement. This argument has two fatal flaws. First, in contrast to plaintiff's suggestion, the language of 36 C.F.R. § 800.6(a) does not even remotely resemble that of 16 U.S.C. § 470h–2(f). The former, for example, requires an agency to "develop and evaluate alternatives or make modifications ... that could avoid, minimize, or miti-

gate adverse effects on historic properties." 36 C.F.R. § 800.6(a). The latter provision, on the other hand, compels the agency to "undertake such planning and actions as may be necessary to minimize harm." 16 U.S.C. § 470h–2(f). NMA's argument therefore makes little sense, because plaintiff asks this Court to draw a conclusion by comparing two completely different sections of the statute. Moreover, even if the Court were able to draw some inference, the statutory provision cited by NMA is silent on whether actions should be taken to minimize harm with respect to all historic properties. Therefore, the Court will defer to the Council's interpretation under step two of *Chevron*.

Similarly, those parts of the Rule that require agency documentation during the section 106 process are not substantive. Sections 800.4(d)(1) and 800.11 compel agencies to provide written documentation for a finding that "either there are no historic properties present or [that] there are historic properties present but the undertaking will have no effect upon them." 36 C.F.R. § 800 .4(d)(1).[22] Section 800.5(c)(3) requires agency documentation of some findings with regard to adverse effects. Section 800.6(b)(1)(iv) requires agencies to execute a Memorandum of Agreement with an SHPO/THPO if they agree on how to resolve adverse effects. These documentation requirements do not prevent or directly impact the substance of agencies' decisions; they simply impose procedural hurdles, and they are therefore permissible under the Act.

NMA also attacks the validity of a provision concerning the identification of historic properties. Section 800.4(c)(2) permits SHPOs, THPOs, Indian Tribes, or the Council to obtain a determination of eligibility from the Secretary of the Interior if any of those groups disagree with an agency's determination on the eligibility of a property for the National Register. 36 C.F.R. § 800 .4(c)(2). If the Secretary of the Interior disagrees with the agency and finds that the disputed property is, in fact, eligible pursuant to 36 C.F.R. part 63, that determination would presumably supersede a contrary finding that had been made by the agency. This does not, however, interfere with any responsibility that has been delegated to the agency by statute. Section 106 expressly grants each agency only the duty to "take into account the effect of the undertaking" on any eligible property. 16 U.S.C. § 470f. The statute does not give the agency the responsibility for making the eligibility determination.[23] Rather, the NHPA authorizes the Secretary of the Interior to make this decision. 16 U.S.C. § 470a(a)(4). Moreover, "[a]ny person . . . may appeal to the Secretary the failure or refusal of a nominating authority [such as a federal agency] to nominate a property." 16 U.S.C. § 470a(a)(5). Section 800.4(c)(2), therefore, merely tracks the provisions of the NHPA by giving the Council and the SHPO/THPO the right to appeal an agency's finding of non-eligibility to the Secretary of the Interior, who possesses the statutory authority to render a final determination on the matter. Because section 800.4(c)(2) does not interfere with an agency's right under the stat-

**22.** NMA also contends that these provisions violate the plain language of the Act because the statute specifically requires agencies to provide documentation only when there are adverse effects present and no agreement has been reached with the Council, or. if there will be a substantial alteration or demolition of historic property. 16 U.S.C. §§ 470h-2(b), (*l*). However, nothing in these provisions of the Act limits the documentation requirement to these contingencies; rather, the statute affirmatively requires writing in those situations. Whether the Council may require documentation as part of its regulations governing the section 106 process is not addressed in the NHPA, and the Court therefore defers to the Council's judgment under step two of *Chevron*. Given the Council's advisory status, the Court extends "substantial even if not full deference" to its decisions under *Chevron. Sheridan Kalorama*, 49 F.3d at 755; *McMillan Park Committee v. National Capital Planning Commission*, 968 F.2d 1283, 1287–88 (D.C.Cir.1992).

**23.** Under the NHPA and National Park Service regulations, states, Indian tribes, and federal agencies share responsibility for determining the eligibility of properties for inclusion in the National Register, and then for nominating for approval by the Secretary of the Interior those properties that they determine to be eligible under the National Register criteria. *See* 16 U.S.C. § 470a; 36 C.F.R. §§ 60.6–.10.

ute, but instead simply incorporates the statutory process for determining the eligibility of property for the National Register, it is a procedural provision and is valid under the NHPA.[24]

Finally, NMA challenges sections 800.4(d)(2), which requires an agency to continue the section 106 process at the Council's request if the Council objects to that agency's determination that there are no historic properties present, or that the existing historic properties will not be affected by the undertaking, and 800.5(c)(3), which grants the Council the authority to review an agency finding of no adverse effects when either an SHPO/THPO or other consulting party disagrees with that finding.[25]

 Both of these provisions cross the line from procedure into substance because they require an agency to proceed with the section 106 process in the face of that agency's own determination to the contrary. "[T]he practical consequences of the[se provisions] would have been such as to interfere with [an agency's] ability to exercise its statutorily guaranteed prerogatives." *Dep't of the Treasury*, 857 F.2d at 821. Section 800.4(d)(2) mandates that an agency proceed with the section 106 process if the Council disagrees with the agency's finding that there are no historic properties in the area, or that the undertaking will not affect historic properties that are present in the area. Under section 800.5(c)(3), "[t]he Council shall review the finding [regarding adverse effects] and notify the agency official of its determination as to whether the adverse effect criteria have been correctly applied .... The Council shall specify the basis for its de-

termination. The agency official shall proceed in accordance with the Council's determination." 36 C.F.R. § 800.5(c)(3). Both of these provisions plainly give the ACHP the authority to review and effectively reverse—at least for the purpose of continuing the section 106 process—the agency's determination with respect to the effects of an undertaking on historic properties. Making that determination, however, is the one substantive role that is expressly delegated to the agency in section 106 of the Act. Sections 800.4(d)(2) and 800.5(c)(3) thereby enable the Council to interfere directly with the agency's responsibility in this respect, and as such, they are impermissible substantive regulations.

With regard to 36 C.F.R. § 800.5(c)(3), defendants counter by arguing that the agency is not required to submit its finding to the Council for review, because it can consult with the objecting party to resolve the disagreement. 36 C.F.R. § 800.5(c)(2)(i). The Rule fails to address, however, what the parties should do if they cannot resolve the dispute; presumably, the agency's finding would then have to be submitted to the Council for review before the undertaking could proceed. Defendants also contend that "[a]lthough the Advisory Council may tell the agency official that it disagrees with the finding of adverse effect, the result is merely that the agency must proceed to the next step under 36 C.F.R. § 800.6." (Defendants' Opp. at 34.) Nonetheless, in that instance the Council's decision has the effect of reversing—at least temporarily—the agency's findings and requiring additional layers of procedure. This substantively restricts the agency's ability to determine

---

24. For a discussion of whether the Council is entitled to require agencies to determine the eligibility of potential historic properties as part of the section 106 process, *see infra* pp. 37–40.

25. Section 800.5(c)(2)(iii) also appears to authorize the Council to review a finding of no adverse effect on its own initiative, following the same procedures as are described herein.

the effects of an undertaking on historic property, which is solely the responsibility of that agency under section 106. "When a [regulation] stipulates procedures that so affect the environment within which an agency is allowed to act that it places the equivalent of a substantive restraint on its ability to act, that proposal has forfeited its claim to procedural purity." *Dep't of the Treasury*, 857 F.2d at 821.

The Court thus concludes that 36 C.F.R. § 800.4(d)(2) is a substantive regulation and therefore violates the plain language of the NHPA. In addition, the Court finds that 36 C.F.R. § 800.5(c)(3) is substantive, in violation of the plain language of the NHPA, to the extent it requires that "[t]he agency official shall proceed in accordance with the Council's determination" regarding the adverse effects of an undertaking on historic property.

## B. Federal Undertakings

Next, plaintiffs contend that the Final Rule impermissibly expands section 106 to include state and local government activities within the ambit of undertakings. Plaintiffs base their argument in large part on *Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750 (D.C.Cir.1995), in which this Circuit held that neither the Republic of Turkey's proposal to demolish its chancery building at 2523 Massachusetts Avenue, N.W. in the District of Columbia and replace it with a new facility, nor the underlying construction project, was an "undertaking" under the NHPA. Plaintiffs' reliance on *Sheridan Kalorama* is misplaced.

In 1992, Congress amended the definition of "undertaking" in the NHPA to read:

"Undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including-

(A) those carried out by or on behalf of the agency;

(B) those carried out with Federal financial assistance;

(C) those requiring a Federal permit license, or approval; and

(D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

16 U.S.C. § 470w(7). The Final Rule contains a nearly identical definition.[26] 36 C.F.R. § 800.16(y). Section 106 of the Act applies to "any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking ...." 16 U.S.C. § 470f. Plaintiffs contend that because Congress did not remove the phrase "Federal or federally assisted" from section 106 when it amended the definition of "undertaking" in 1992, it clearly intended section 106 to govern only a subset of undertakings.

This Circuit has found otherwise. In *Sheridan Kalorama*, this Circuit held that the Secretary of State's decision not to veto Turkey's proposal under the Foreign Missions Act, 22 U.S.C. § 4301, *et seq.*, was not an "undertaking" under the NHPA. The Court held that in order to give the licensing provision of section 106 any effect, "[w]e infer ... that the amending Congress intended to expand the definition of an 'undertaking'—formerly limited to federally funded or licensed projects—to include projects requiring a federal 'permit' or merely federal 'approval.'" *Sheridan Kalorama*, 49 F.3d at 755. In other words, this Circuit conclud-

---

**26.** The Final Rule differs from the statute only in that the phrase "on behalf of a Federal agency" replaces "on behalf of the agency" in subsection (A). *Compare* 36 C.F.R. § 800.16(y) *with* 16 U.S.C. § 470w(y).

ed that section 106 applied to the full range of undertakings defined in 16 U.S.C. § 470w(y).[27] Because the definition of "undertaking" in the Final Rule is essentially identical to the plain language of the statute, the regulations are consistent with the Act with regard to the meaning of "undertaking." [28]

Cases cited by plaintiff to the contrary are inapposite. *Woodham v. FTA*, 125 F.Supp.2d 1106, 1110 (N.D.Ga.2000), and *Maxwell St. Historic Pres. Coalition v. Board of Trustees of Univ. of Ill.*, 2000 WL 1141439 (N.D.Ill. Aug. 11, 2000), involved specific challenges to applications of the NHPA by an agency. *Gettysburg Battlefield Pres. Ass'n v. Gettysburg College*, 799 F.Supp. 1571 (M.D.Pa.1992), addressed whether a specific project arose under the NHPA for jurisdictional purposes.[29] In any event, it is the agencies themselves—and not the Council's regulations—that determine whether a particular project is an

"undertaking" under section 106. 36 C.F.R. § 800.3(a). The Court therefore finds that this facial challenge to the definition of undertaking in the Final Rule must fail.[30]

## C. Eligibility Determinations

NMA also argues that the Final Rule impermissibly requires agencies to perform an independent determination of the eligibility of properties for the National Register. Section 106 of the Act provides that agencies must take into account the effect of a proposed undertaking on any property that "is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. The Final Rule requires agencies to "[r]eview existing information on historic properties within the area of potential effects, including any data concerning possible historic properties not yet identified." 36 C.F.R. § 800.4(a)(2). In other words, before determining whether

**27.** The Court's holding in *Sheridan Kalorama* was limited to a finding that the meaning of "license" in that particular instance was not "so broad as to encompass failure to disapprove a proposal." *Id.* at 756. Yet the Court expressly reserved judgment on whether a ACHP Final Rule that defined "undertaking" to include any project that "requires a Federal permit, license, or approval, including agency authority to disapprove or veto the project" would be permissible under the NHPA. *Id.* at 755. At that time, the Council had proposed such a definition, but the Court decided that it should not "defer to an agency's proposed interpretation, upon which it is still considering public comments." *Id.* As it turns out, the Court's restraint was prescient, because the current Final Rule does not go so far as to include within the definition of undertaking a project over which a federal agency retains veto—but not approval—power.

**28.** NMA also argues that the extension of the section 106 process to activities that lack a federal nexus is arbitrary and capricious. Again, however, the definition of "undertaking" in the Final Rule is virtually identical to that in the Act; the scope of undertakings

covered by the regulations is the same as that under the statute. The Final Rule is therefore not arbitrary and capricious in this regard.

**29.** Plaintiff's use of *Gettysburg Battlefield* is of no assistance, since that case was decided before the 1992 amendments to the NHPA.

**30.** NMA argues that the Final Rule attempts to regulate individual state-issued permits authorized by state statutes under such programs as the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1253(a), *et seq.*, the Clean Water Act, 33 U.S.C. §§ 1251(b), 1342(b), and the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6926(b), (d), and seeks a declaratory judgment that section 106 does not apply to state permits issued under these and other, similar statutes. However, plaintiffs have challenged the Final Rule on its face, rather than as it is applied to specific situations. And on its face, the Final Rule does not speak to whether programs authorized by these statutes are "undertakings." Therefore, the Court cannot address plaintiffs' request for a declaratory judgment in the context of this lawsuit.

there are any adverse effects, the agency must identify three categories of properties: those that are included in the National Register; those that are eligible for inclusion in the National Register; and those that may be eligible for inclusion in the National Register. As for the first two groups, the agency is required to assess adverse effects, *see* 36 C.F.R. § 800.5; however, with respect to the third group, the agency—in consultation with SHPOs, THPOs, and other interested parties—must determine whether the identified properties are in fact eligible for inclusion in the National Register pursuant to the official criteria set forth in 36 C.F.R. pt. 63. 36 C.F.R. § 800.4(c)(1). If the properties are eligible under those regulations, the agency must proceed with the section 106 process. 36 C.F.R. § 800.4(c)(2). If not, then the agency is not required to assess adverse effects.

NMA's primary argument is that the Final Rule impermissibly expands the scope of the statute by extending section 106 to properties which are only potentially eligible for the National Register. This contention, however, is based on a misinterpretation of the regulations in conjunction with the NHPA. As NMA notes, "eligible for inclusion in the National Register" is a term of art, based on regulations issued by the National Park Service ("NPS") of the Department of the Interior pursuant to 16 U.S.C. § 470a. Those regulations were "developed to assist federal agencies in identifying and evaluating the eligibility of properties for inclusion in the National Register," 36 C.F.R. § 63.1(a), and they describe the process for determining the eligibility of identified properties, 36 C.F.R. §§ 60.4, 63.2–63.3, and for reviewing and nominating eligible properties for publication in the National Register. 36 C.F.R. § 63.6.[31]

The plain language of the NHPA requires consideration of adverse effects with respect to two classes of properties—those that are included in the National Register and those that are eligible under 36 C.F.R part 63. The Final Rule tracks this language by similarly restricting the adverse effect assessment process to those two categories of properties. The statute is silent, however, with respect to the prior step—whether an agency may be required

---

**31.** Under both the NPS and ACHP regulations, it is the agency itself—in consultation with the SHPO—that may apply the National Register Criteria for Evaluation to determine the eligibility of an historic property. *See* 36 C.F.R. §§ 60.4, 63.2, 800.4. Although the ultimate determination of eligibility under NPS regulations is made by the Keeper of the National Register, 36 C.F.R. § 63.3, the Council's regulations omit this final step. NMA contends that this distinction invalidates the regulations, because the statute requires a formal determination of eligibility by the Department of the Interior. This interpretation is contrary to the existing case law. As the Fifth Circuit noted, "[a] plain reading of section 106 ... persuades us that property qualifies as eligible property on the basis of literal eligibility under the National Register criteria. Consequently, we conclude that eligible property is not restricted to property that has been officially *determined* eligible for inclusion in the National Register." *Boyd v. Roland,* 789 F.2d 347, 349 (5th Cir.1986) (emphasis in original); *see Colorado River Indian Tribes v. Marsh,* 605 F.Supp. 1425, 1437 (C.D.Cal.1985) ("What is an eligible property for purposes of NHPA turns upon the inherent historical and cultural significance of the property and not opinion of its worth by the Secretary of the Interior. Under NHPA, properties that are a part of the rich heritage of our nation are afforded the same guarantees of protection afforded properties already determined eligible."). Moreover, the Final Rule is consistent with an exception in the NPS Rule: "Notwithstanding [the formal determination by the Keeper], the Federal agency ... may consider the property eligible for the purpose of obtaining the Advisory Council on Historic Preservation's comments" under section 106. 36 C.F.R. § 63.3.

to review properties located in the vicinity of the undertaking to determine if any are eligible under the established criteria.[32] Legislative history is similarly unenlightening on this issue; NMA's discussion shows only that Congress intended to confine agency comments on properties during the section 106 process to those that were included in or eligible for the National Register, which is exactly what the Final Rule does. *See* S.Rep. No. 94–367, at 33 (1975).

Because the statute is ambiguous with regard to whether an agency must survey nearby properties to determine their eligibility for the National Register before proceeding under section 106, the Court will defer to the expertise of the ACHP under step two of *Chevron,* thereby finding that the Final Rule is based on a permissible construction of the statute.[33] Moreover, it is clear that the Final Rule, as written, furthers the express purposes of the Act and is therefore neither arbitrary nor capricious. As the Council noted in the Preamble to the regulations:

> Well-established Department of the Interior regulations regarding formal determinations of eligibility specifically acknowledge the appropriateness of section 106 consideration of properties that Federal agencies and SHPOs determine meet the National Register criteria. *See* 36 C.F.R. § 63.3.... Not only does the statute allow this interpretation, but it is the only interpretation that reflects (1) the reality that not every single acre of land in this country has been surveyed for historic properties, and (2) the NHPA's intent to consider all properties of historic significance. It has been estimated that of the approximately 700 million acres under the jurisdiction or control of Federal agencies, more than 85 percent of these lands have not yet been investigated for historic properties. Even in investigated areas, more than half of identified properties have not been evaluated against the criteria of the National Register of Historic Places. These estimates represent only a part of the historic properties in the United States since the section 106 process affects properties both on Federal and non-Federal land. Finally, the fact that a property has never been considered by the Keeper neither diminishes its importance nor signifies that it lacks the characteristics that would qualify it for the National Register.

Preamble, 65 Fed.Reg. 77705.

The Court therefore upholds the regulations requiring an agency to identify properties that may be eligible for the National Register and to determine whether, in fact, those properties are eligible before proceeding with the section 106 process.

### D. The Role of Indian Tribes

NMA also argues that the Council has exceeded the scope of its authority under the Act by promulgating regulations ad-

---

**32.** NMA argues that the Final Rule conflicts with the basic structure of the NHPA, which already requires SHPOs to perform a comprehensive survey of historic properties to identify those that may be eligible for the National Register. *See* 16 U.S.C. § 470a(b)(3)(A). Similar provisions exist for those properties under federal, 36 C.F.R. § 60.9, or Indian control. 16 U.S.C. § 470a(d)(6)(A). Again, however, none of these provisions prohibits such a survey in the context of the section 106 process, and the Council's requirement clearly furthers the purpose of the NHPA—"the preservation of [the] irreplaceable heritage ... of the Nation." 16 U.S.C. § 470(b).

**33.** As noted, given the Council's advisory status, the Court extends "substantial even if not full deference" to its decisions under *Chevron. Sheridan Kalorama,* 49 F.3d at 755; *McMillan Park Committee,* 968 F.2d at 1287–88.

dressing the role of Indian tribes. Plaintiff contends that any such regulations are necessarily issued pursuant to section 101 of the Act—not section 106—and that even if the Council can implement rules under that provision, the current regulations exceed the scope of the authority intended by Congress. The Court disagrees, and holds that the Final Rule is properly within the scope of the Council's authority under section 211 of the Act to implement the section 106 process.

■ Section 101 of the Act requires the Secretary of the Interior to

establish a program and promulgate regulations to assist Indian tribes in preserving their particular historic properties. The Secretary shall foster communication and cooperation between Indian tribes and State Historic Preservation Officers in the administration of the national historic preservation program to ensure that all types of historic properties and all public interests in such properties are given due consideration, and to encourage coordination among Indian tribes, State Historic Preservation Officers, and Federal agencies in historic preservation planning and in the identification, evaluation, protection, and interpretation of historic properties.

16 U.S.C. § 470a(d)(1)(A). However, the 1992 amendments to the Act added several provisions relating to Indian tribes and Native Hawaiian organizations. Among these was 16 U.S.C. § 470a(d)(6)(B): "In carrying out its responsibilities under [section 106], a Federal agency shall consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to properties that [may be determined to be eligible for inclusion in the National Register]." 16 U.S.C. § 470a(d)(6)(B). In no uncertain terms, section 101 of the Act directs federal agencies to consult with Indian tribes as part of the section 106 process; and section 211 of the Act requires the Council to issue regulations governing the section 106 process. Requiring consultation with Indian tribes in the Final Rule falls squarely within the plain meaning of the NHPA.[34]

### E. Conflicts with Other Statutes

Plaintiff CTIA contends that the Final Rule interferes with the fundamental goals and policies of other statutes and that the regulations are invalid because they operate to repeal these other statutes by implication. In particular, CTIA contends that the 1993 amendments to the Communications Act of 1934, 47 U.S.C. § 151, et seq., expressly limited state jurisdiction over Commercial Mobile Radio Service ("CMRS") providers in order to foster a national telecommunications system. Under the Final Rule, however, CMRS providers are required to coordinate with state regulatory bodies. CTIA argues that "the Council's rules have given SHPOs de facto control over CMRS entry, in violation of Congress' clear intent to preempt state authorities from effectively prohibiting or delaying entry. SHPOs now have the ability to impose time consuming and costly processes that serve to

---

**34.** NMA also contests specific provisions of the Final Rule, claiming that these regulations effectively give Indian tribes veto power over agency determinations of eligibility and no adverse effect, and requiring agency deference to the tribes' expertise. None of these provisions, however, gives Indian tribes veto power over any agency decision; rather, they merely grant THPOs the right to challenge an agency determination with which they disagree, see 36 C.F.R. §§ 800.4(c)(2), 800.5(c)(2)(ii), or require the agency to acknowledge the expertise of the tribes in assessing historic properties with significance to them. Id. § 800.4(c)(1). These provisions are consistent with the tribe's role as consultant, as set forth in 16 U.S.C. § 470a(d)(6)(B).

delay the deployment of telecommunications services nationwide. This erects barriers to entry under the guise of historic preservation." (CTIA Mem. at 39.)

■■■■ This argument is baseless. The NHPA and the Council's Final Rule are procedural; they do not dictate the outcome of proposed undertakings and therefore do not interfere with other statutes. Where, as here, two statutes are capable of co-existence, both should be regarded as effective absent a clearly expressed Congressional intention to the contrary. *Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Nowhere in the Communications Act did Congress repeal the NHPA or excuse the telecommunications industry or the FCC from compliance with the NHPA or the Final Rule. Defendants' regulations therefore do not repeal the Communications Act by implication.[35]

## V. Plaintiffs' Constitutional Claims

Plaintiffs also make three constitutional arguments to invalidate the Final Rule. First, they assert that the Final Rule's criteria for identifying adverse effects are vague and overbroad, and therefore violate the Due Process Clause of the Fifth Amendment. Second, they contend that the Rule's treatment of Native American and Hawaiians violates the Establishment Clause of the First Amendment. Third, they claim that the Appointments Clause prohibits the Council as currently constituted from exercising the regulatory powers it has delegated to itself. None of these arguments has merit.

## A. Void for Vagueness

■■■■ Plaintiffs' first constitutional argument is that the regulations for identifying

adverse effects are void for vagueness. That doctrine "reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Roberts v. United States Jaycees*, 468 U.S. 609, 629, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (internal quotations omitted). Due process prohibits a "lack of precision" in language that gives those enforcing the law "an impermissibly wide discretionary range in which to determine who is in violation." *Community for Creative Non–Violence v. Turner*, 893 F.2d 1387, 1395 (D.C.Cir. 1990).

■■■■ Plaintiffs contend that the criteria set forth for identifying an adverse effect in 36 C.F.R. § 800.5(a)(1) are unconstitutionally vague. That provision provides:

An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association.

*Id.* Plaintiffs highlight the terms "may alter," "indirectly," "any characteristics," "feeling," and "association" as potentially allowing for discriminatory and arbitrary enforcement of the regulation by federal agencies and the Council, in violation of the Fifth Amendment. Plaintiffs, however, provide no support in the case law to suggest that any of these terms are constitutionally infirm, and they fail to cite any concrete factual situation in which the cri-

---

**35.** In fact, the FCC has recently acknowledged its obligations under section 106 and invoked the provisions of 36 C.F.R. § 800.14 by entering into a programmatic agreement, thereby streamlining the section 106 process and harmonizing its requirements with the mandates of the Communications Act. 66 Fed. Reg. 17,554 (Apr. 2, 2001).

teria have been applied at all, let alone in a manner that would implicate due process principles of vagueness.

In fact, defendants have done a laudable job of enumerating criteria for adverse effects in a field—historic preservation—that involves intangibles and inexact, subjective elements. *See Concerned Citizens Alliance, Inc. v. Slater,* 176 F.3d 686, 697 (3d Cir.1999) (noting that "intangibles like streetscapes and layouts of roads are important to the integrity of historic districts" and that an agency "must consider more than the individual buildings and structures in an historic district when analyzing the impact of a project"). Accordingly, the adverse effect criteria are directly related to the criteria issued by the Secretary of the Interior, pursuant to Section 101(a)(2) of the Act, for nominating properties for inclusion in the National Register. 36 C.F.R. § 800.5(a)(2); *see* 36 C.F.R. § 60.4 (National Register Criteria for Evaluation). This provision, in turn, references the National Register Technical Bulletin, "How To Apply the National Register Criteria for Evaluation," which defines in detail the terms in 36 C.F.R. § 800.5(a)(1). *See, e.g.,* National Register Technical Bulletin, "How To Apply the National Register Criteria for Evaluation" at 15 <http://www.cr.nps.gov/nr/publica-

tions> ("Association is the direct link between an important historic event or person and a historic property. A property retains association if it is the place where the event or activity occurred and is sufficiently intact to convey that relationship to an observer. Like feeling [which is also defined in detail], association requires the presence of physical features that convey a property's historic character.").[36] Plaintiffs' vagueness challenge to the Final Rule is thus without merit.

## B. Establishment Clause

Plaintiffs next contend that the regulations violate the Establishment Clause of the First Amendment because they grant a special preference for the religious practices of Native Americans and Hawaiians. 16 U.S.C. § 470a(d)(6)(B) requires federal agencies to "consult with any Indian Tribe or Native Hawaiian organization that attaches religious and cultural significance" to properties that are of religious or cultural importance to either of those groups. The Council's regulations implement this provision. *See, e.g.,* §§ 800.2(c)(2)(ii)(D), 800.4(c)(1), 800.4(d)(1), 800.5(c)(2)(ii).[37]

Establishment Clause-based challenges to government action involving religious interests are subject to a well-

---

**36.** In one particularly imaginative argument, plaintiffs contend that the Final Rule diverges from the Bulletin criteria because the former requires only that the undertaking would diminish *one* of "the integrity of the property's location, design, setting, materials, workmanship, feeling, or association," § 800.5(a)(1), while the Bulletin requires a finding that *"several,* and usually *most,* of the aspects" exist in order for a property "to retain historic integrity." Bulletin at 1 (emphasis added). Therefore, plaintiffs write, "Unlike the National Register's requirement for a finding of most, if not all, of the factors of integrity, the Final Rule's test is disjunctive and requires a finding of only one factor." (NMA Opp. at 54.) Plaintiffs' argument is backward: If "several, and usually most" of these factors are re-

quired for a property to be designated for the National Register, it is logical that an effect on *any one* of these factors would alter the property's ability to qualify for the National Register—the precise definition of an adverse effect. In any event, plaintiffs' argument would be fruitless even if it were logically sound, because the Final Rule is by no means required to conform to the Bulletin, which merely serves to expand on the criteria in the regulations.

**37.** Because the Final Rule does nothing but implement the Act, plaintiffs' Establishment Clause challenge should be waged against the statute, rather than the regulations. In any event, the statute would easily survive an Es-

established three-part test. First, the regulation must have a secular purpose. Second, the principle or primary effect of the regulation must be one that neither advances nor inhibits religion. Third, the regulation may not foster excessive government entanglement with religion. *Stone v. Graham,* 449 U.S. 39, 40, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). The Final Rule satisfies each of these three prongs.

Plaintiffs first argue that the purpose of the provisions at issue is "to grant preferred status to the religious views of Indians and Native Hawaiians." (NMA Opp. at 55.) This is incorrect, for the Final Rule's express purpose is historic preservation, which is decidedly secular. 36 C.F.R. § 800.1(a). The consultations with THPOs and Hawaiian organizations are intended to provide agency officials with sufficient information to address the effects of proposed undertakings on historical properties with cultural or religious significance.

Similarly, the primary effect of the Final Rule is neither to advance nor inhibit a religious purpose. Rather, the regulations require federal agencies to consult with Native American and Hawaiian officials regarding properties with cultural or religious significance. The Final Rule therefore ensures that these viewpoints are taken into consideration equally; it does not advance a religious purpose. As the Council noted in the Preamble to the Final Rule:

The rule and section 101(d)(6) of the NHPA only require consultation with Indian Tribes regarding those historic properties of significance to them. The Federal agency must consult with such Tribes, but is nowhere required to abide by the opinions expressed by the Tribes in such consultations. Furthermore, such consultation provisions are fully justified and reasonable. They do not provide the Tribes with a "special treatment," but rather a rational treatment. Just as it would be common sense for a person to consult, for example, with the Navy in order to seek a better understanding of the history of Pearl Harbor, it is more than rational to go to Tribes to seek a better understanding of historic properties to which they attach a religious and cultural significance.

65 Fed.Reg. at 77716–17.

Finally, the Final Rule does not foster excessive government entanglement with religion. The regulations require the same types of consultation with THPOs and Native Hawaiian organizations that they require with SHPOs and other consulting parties. And once these consultations are complete, the agency may move forward with the proposed undertaking. The regulations therefore do not violate the Establishment Clause.[38]

## C. Appointments Clause

■ Plaintiffs' final argument is that the Final Rule violates the Appointments

tablishment Clause challenge for the same reasons as the regulations do.

**38.** Plaintiffs rely on *Bear Lodge Multiple Use Ass'n v. Babbitt,* No. 96–CV–063–D, slip op. (D.Wyo. June 8, 1996), in support of their Establishment Clause argument. *Bear Lodge,* however, addressed the National Park Service's decision to exclude a legitimate public use of Devil's Tower National Monument for the sole purpose of advancing American Indians' religious practices. There, the purpose

of the government action was to promote religion, and NPS' regulations were entangled with the advancement of a particular religious practice. *Id.* at 11. Here, in contrast, the purpose of the regulations is secular, there is no entanglement, and the rules do not advance a particular religious *practice;* instead, they only require consultation regarding historic properties with religious *significance.* This distinction epitomizes the difference between the two situations; *Bear Lodge* was

Clause of the Constitution by delegating to the Council "substantial powers" even though two of its twenty members are not appointed by the President.[39] (NMA Opp. at 57.) NMA's sole support for this proposition is *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In *Buckley,* however, the Supreme Court found that the Appointments Clause was violated because none of the voting members of the Federal Election Commission (FEC) had been appointed by the President, but they had "enforcement power, exemplified by [the] discretionary power to seek judicial relief." *Id.* at 137–38, 96 S.Ct. 612. The Court held that this "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" was exactly the type of duty that could only be performed by "Officers of the United States" under the Appointments Clause. *Id.* at 140, 96 S.Ct. 612. In contrast, the instant action involves procedural regulations governing the effects of federal undertakings on historic properties. The Council's role is to define that process and comment on its substance—a role that could not be further from that which was at issue in *Buckley.* Plaintiffs' Appointments Clause challenge to the regulations is therefore rejected.

## CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment is granted in part, and plaintiffs' cross-motion for summary judgment is granted in part. The Court finds that the Final Rules are valid under both the APA and the Constitution, with the exception of 36

about government action that aided a religion, whereas this case is about government action that advances the purpose of historic preservation.

C.F.R. §§ 800.4(d)(2) and 800.5(c)(3). The Court concludes that 36 C.F.R. § 800.4(d)(2) is a substantive regulation and therefore violates the plain language of the NHPA. In addition, the Court finds that 36 C.F.R. § 800.5(c)(3) is substantive, in violation of the plain language of the NHPA, to the extent it requires that "[t]he agency official shall proceed in accordance with the Council's determination" regarding the adverse effects of an undertaking on historic property.

A separate order accompanies this opinion.

## *ORDER*

Upon consideration of the parties' cross-motions for summary judgment and respective oppositions and replies, and the entire record herein, it is hereby

**ORDERED** that defendants' motion to dismiss or for summary judgment [60–1] is **GRANTED IN PART**; and it is

**FURTHER ORDERED** that plaintiff NMA's cross-motion for summary judgment [65–1] and plaintiff CTIA's cross-motion for summary judgment [65–2] are **GRANTED IN PART**; and it is

FURTHER ORDERED that 36 C.F.R. § 800.4(d)(2) is declared invalid; and it is

FURTHER ORDERED that 36 C.F.R. § 800.5(c)(3) is declared invalid insofar as it requires that "[t]he agency official shall proceed in accordance with the Council's determination" regarding the adverse effects of an undertaking on historic property.

SO ORDERED.

**39.** For the text of the Appointments Clause, *see supra* note 7.